Anthony LOBATO, as an individual and as parent and natural guardian of Taylor Lobato and Alexa Lobato; Denise Lobato, as an individual and as parent and natural guardian of Taylor Lobato and Alexa Lobato; Jaime Hurtado and Coralee Hurtado, as individuals and as parents and natural guardians of Maria Hurtado and Evan Hurtado; Janet L. Kuntz, as an individual and as parent and natural guardian of Daniel Kuntz and Stacey Kuntz; Pantaleon Villagomez and Maria Villagomez, as individuals and as parents and natural guardians of Chris Villagomez, Monique Villagomez and Angel Villagomez; Linda Warsh, as an individual and as parent and natural guardian of Adam Warsh, Karen Warsh and Ashley Warsh; Elaine Gerdin, as an individual and as parent and natural guardian of N.T., J.G. and N.G.; Dawn Hartung, as an individual and as parent and natural guardian of Q.H.; Paul Lastrella, as an individual and as parent and natural guardian of B.L.; Woodrow Longmire, as an individual and as parent and natural guardian of Tianna Longmire; Steve Seibert and Dana Seibert, as individuals and as parents and natural guardians of Rebecca Seibert and Andrew Seibert; Olivia Wright, as an individual and as parent and natural guardian of A.E. and M.E.; Herbert Conboy and Victoria Conboy, as individuals and as parents and natural

guardians of Tabitha Conboy and Timothy Conboy; Terry Hart, as an individual and as parent and natural guardian of Katherine Hart; Larry Howe–Kerr and Kathy Howe–Kerr, as individuals and as parents and natural guardians of Lauren Howe–Kerr and Luke Howe–Kerr; John T. Lane, as an individual; Jennifer Pate, as an individual and as parent and natural guardian of Ethan Pate and Evelyn Pate; Robert L. Podio and Blanche J. Podio, as individuals and as parents and natural guardians of Robert Podio and Samantha Podio; Tami Quandt, as an individual and as parent and natural guardian of Brianna Quandt, Cody Quandt and Levi Quandt; Brenda Christian, as an individual and as parent and natural guardian of Ryan Christian; Toni L. McPeek, as an individual and as parent and natural guardian of M.J. McPeek, Cassie McPeek and Michael McPeek; Christine Tiemann, as an individual and as parent and natural guardian of Emily Tiemann and Zachary Tiemann; Paula VanBeek, as an individual and as parent and natural guardian of Kara VanBeek and Antonius VanBeek; Larry Haller and Pennie Haller, as individuals and as parents and natural guardians of Kelly Haller and Brandy Haller; Tim Hunt and Sabrina Hunt, as individuals and as parents and natural guardians of Shannon Moore–Hiner, Eris Moore, Darean Hunt and Jeffrey Hunt; Mike McCaleb and Julie McCaleb, as individuals and as parents and natural guardians of Rebekka McCaleb, Layne McCaleb and Lynde McCaleb; Todd Thompson and Judy Thompson, as individuals and as parents and natural guardians of Garson Thompson and Tarek Thompson; Doug Vondy and Denise Vondy, as individuals and as parents and natural guardians of Kyle Leaf and Hannah Vondy; Brad Weisensee and Traci Weisensee, as individuals and as parents and natural guardians of Joseph Weisensee, Anna Weisensee, Amy Weisensee and Elijah Weisensee; Stephen Topping, as an individual and as parent and natural guardian of Michael Topping; Donna Wilson, as an individual and as parent and natural guardian of Ari Wilson, Sarah Patterson, Madelyn Patterson and Taren Wilson–Patterson; David Maes, as an individual and as parent and natural guardian of Cherie Maes; Debbie Gould, as an individual and as parent and natural guardian of Hannah Gould, Ben Gould and Daniel Gould; Lillian Leroux, as an individual and as parent and natural guardian of Ari Leroux, Lillian Leroux, Ashley Leroux, Alexandria Leroux and Amber Leroux; Theresa Wrangham, as an individual and natural guardian of Rachel Wrangham and Deanna Wrangham; Alamosa School District, No. RE–11J; Centennial School District No. R–1; Center Consolidated School District No. 26 JT, of the Counties of Saguache and Rio Grande and Alamosa; Creede Consolidated School District No. 1 in the County of Mineral and State of Colorado; Del Norte Consolidated School District No. C–7; Moffat School District No. 2, in the County of Saguache and State of Colorado; Monte Vista School District No. C–8; Mountain Valley School District No. RE 1; North Conejos School District No. RE 1J; Sanford School District No. 6, in the County of Conejos and State of Colorado; Sangre De Cristo School District, No. RE–22J; Sargent School District No. RE–33J; Sierra Grande School District No. R–30; and South Conejos School District No. RE 10, Petitioners

v.

The STATE of Colorado; Colorado State Board of Education; Dwight Jones, in his official capacity as Commissioner of Education of the State of Colorado; and Bill Ritter, in his official capacity as Governor of the State of Colorado, Respondents.

No. 08SC185.

Supreme Court of Colorado,
En Banc.

Oct. 19, 2009.

Alexander Halpern LLC, Alexander Halpern, Michelle Murphy, Jennifer Albert Morgan, Kathleen J. Gebhardt LLC, Kathleen J. Gebhardt, Boulder, Colorado, Attorneys for Petitioners.

John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Antony B. Dyl, Senior Assistant Attorney General, Carey Taylor Markel, Senior Assistant Attorney General, Denver, Colorado, Attorneys for Respondents.

Kutz & Bethke LLC, William P. Bethke, Lakewood, Colorado, Attorneys for Amicus Curiae Colorado League of Charter Schools.

Colorado Association of School Boards, Kathleen Sullivan, Denver, Colorado, Attorneys for Amici Curiae Colorado Association of School Boards and Colorado Association of School Executives.

Colorado Education Association, Martha R. Houser, Bradley C. Bartels, Denver, Colorado, Attorneys for Amicus Curiae Colorado Education Association.

Kelly Garnsey Hubbell ± Lass LLC, Martha M. Tierney, Denver, Colorado, Attorneys for Amicus Curiae Education Justice at Education Law Center.

Morrison & Foerster LLP, Steven M. Kaufmann, Osman E. Nawaz, Denver, Colorado, Colorado Center on Law and Policy, Edwin S. Kahn, Special Counsel Denver, Colorado, Attorneys for Amici Curiae Colorado Lawyers Committee and the Colorado Center on Law and Policy.

Davis Graham & Stubbs LLP, Kenzo S. Kawanabe, Terry R. Miller, Denver, Colorado, Attorneys for Amicus Curiae Great Education Colorado.

Maldef, David G. Hinojosa, Nina Perales, San Antonio, Texas, Holme, Roberts & Owen, LLP, Manuel L. Martinez, Denver, Colorado, Attorneys for Amici Curiae Padres Unidos, and the Multicultural Education, Training & Advocacy, Inc.

Justice BENDER delivered the Opinion of the Court.

## I. Introduction

In this appeal, we review the court of appeals' decision that the plaintiff school districts lack standing to sue the state, and that plaintiff parents, who challenge the adequacy of our public school funding system under the education clause of the Colorado Constitution, presented a nonjusticiable political question. *Lobato v. State*, 216 P.3d 29 (Colo. App.2008). We reverse the court of appeals' holdings that the plaintiff school districts lack standing to sue the state and that the plaintiffs have alleged a nonjusticiable claim.

Plaintiffs are composed of two groups. The first group consists of parents from eight school districts across the state acting in their individual capacities and on behalf of their school age children ("plaintiff parents"). The second group consists of fourteen school districts in the San Luis Valley ("plaintiff school districts"). Plaintiffs brought suit against the State of Colorado, the Colorado State Board of Education, the Commissioner of Education, and the Governor (collectively "state defendants"), alleging constitutional deficiencies in Colorado's public school financing system. Plaintiffs claim that the system, because it is underfunded and allocates funds on an irrational and arbitrary basis, violates the education clause's mandate that the General Assembly provide a "thorough and uniform" system of public education. *See* Colo. Const. art. IX, § 2. Plaintiffs further claim that the local school districts have standing to challenge the adequacy of the state's public school financing system because severe underfunding and irrational disbursement of funds undermine the districts' interest in local control over educational instruction and quality. *See* Colo. Const. art. IX, § 15.

Without taking evidence, the trial court held that plaintiff school districts lacked standing to bring their claims, but did not address the standing of the plaintiff parents. The trial court also dismissed the plaintiffs' complaint for failure to state a claim. The

court of appeals affirmed the district court's holding that plaintiff school districts lacked standing, but held that plaintiff parents did have standing. *Lobato v. State*, 216 P.3d at 34–35. The court of appeals also affirmed the dismissal of plaintiff's complaint for failure to state a claim. *Lobato v. State*, 216 P.3d at 35–42.

The plaintiff school districts appeal their dismissal for lack of standing. Additionally, both the plaintiff parents and the plaintiff school districts appeal the holding that their claims present a nonjusticiable political question. Because this case was dismissed before either side presented evidence, our precedent requires that we accept the plaintiffs' factual allegations as true.

As a threshold matter, we examine whether the court of appeals should have addressed the school districts' standing. Because none of the parties contest that the plaintiff parents possess standing, we hold that it was unnecessary for the court of appeals to decide this issue, and reverse the court of appeals on this issue.

Next, we examine whether the plaintiffs present a justiciable claim for relief. The education clause, article IX, section 2 of the Colorado Constitution, states in relevant part that "the general assembly shall ... provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state...." The state defendants argue that the plaintiffs raise a nonjusticiable political question in that the judiciary lacks manageable standards by which to resolve the issue. They further argue that the plaintiffs' claims are precluded by article IX, section 17 of the Colorado Constitution ("Amendment 23").

We reject both of the state defendants' arguments. We have never applied the political question doctrine to avoid deciding a constitutional question, and we decline to do so now. We interpret this court's decision in *Lujan v. Colorado State Board of Education*, 649 P.2d 1005 (Colo.1982), to hold that it is the responsibility of the judiciary to determine whether the state's public school financing system is rationally related to the constitutional mandate that the General Assembly provide a "thorough and uniform" system of

public education. Such a rational basis review satisfies the judiciary's obligation to evaluate the constitutionality of the state's public school financing system without unduly infringing on the legislature's policymaking authority. The court's task is not to determine "whether a better financing system could be devised," *Id.* at 1025, but merely to determine whether the system passes constitutional muster.

As was the case in *Lujan*, this claim triggers the court's responsibility to review the state's public school funding scheme to determine whether the existing funding system is rationally related to the General Assembly's constitutional mandate to provide a "thorough and uniform" system of public education. Treating the plaintiffs' allegations as true, we hold that plaintiffs' constitutional challenges to Colorado's public school financing scheme are justiciable.

Article IX, section 17 of the Colorado Constitution ("Amendment 23") does not affect our holding that the plaintiffs present a justiciable claim for relief. Amendment 23 prescribes minimum increases for state funding of education, but it was not intended to qualify, quantify, or modify the "thorough and uniform" mandate expressed in the education clause, which *Lujan* recognized as an appropriate subject for judicial review and interpretation. Amendment 23 neither relates to nor concerns the "thorough and uniform" mandate in the education clause and, therefore, does not affect our holding that the plaintiffs present a justiciable claim for relief.

Accordingly, the plaintiffs must be provided the opportunity to prove their allegations. To be successful, they must prove that the state's current public school financing system is not rationally related to the General Assembly's constitutional mandate to provide a "thorough and uniform" system of public education. On remand, the trial court must give substantial deference to the legislature's fiscal and policy judgments. It may appropriately rely on the legislature's own pronouncements concerning the meaning of a "thorough and uniform" system of education. If the trial court finds the current system of public finance irrational and thus unconstitu-

tional, then that court must permit the legislature a reasonable period of time to change the funding system so as to bring the system in compliance with the Colorado Constitution.

Hence, we reverse the judgment of the court of appeals. We remand this case to the court of appeals to be returned to the trial court for proceedings consistent with this opinion.

## II. Plaintiffs' Complaint and Proceedings Below

### A. Plaintiffs' Complaint

Plaintiffs allege that Colorado's school financing system is underfunded and distributes funds on an irrational and arbitrary basis in violation of the education clause's mandate of a "thorough and uniform" system of public education. *See* Colo. Const. art. IX, § 2. They allege that the finance system particularly fails to provide a constitutionally adequate education to students with disabilities and to students from lower socio-economic backgrounds, ethnic and racial minorities, and non-English speaking families. Plaintiffs further claim that, because of a lack of access to sufficient financial resources and irrational restrictions on spending, local school districts lack meaningful control over educational instruction and quality, violating the districts' interest in local control and impairing their ability to implement the education clause's mandate. *See* Colo. Const. art. IX, §§ 2, 15.[1]

To assist in defining and measuring whether the "thorough and uniform" mandate of the education clause has been met, plaintiffs cite the minimum public school content standards and performance objectives enacted by the legislature in furtherance of its constitutional obligations.[2] Plaintiffs argue that the state violated the education clause by failing to provide sufficient funds to enable the school districts to satisfy both the content standards and performance objectives in the education reform legislation. As evidence, plaintiffs cite data indicating that students of color, English language learner ("ELL") students, students with disabilities, and economically disadvantaged students failed to meet certain proficiency targets set by the Consolidated State Plan, a plan adopted by the state in order to comply with the requirements of the No Child Left Behind Act of 2001, 20 U.S.C. §§ 6301–6578 (2006).

Plaintiffs detail specific complaints with the following components of the education funding system: the Public School Finance Act ("PSFA"), sections 22–54–101 to–134, C.R.S. (2009); categorical program funding (non-PSFA funding for specific programs serving certain underserved student populations); and capital construction funding.

According to the complaint, the PSFA sets a base funding amount for school districts, or "total program funding," which is financed by a combination of state and local revenues. Local revenues are generated by a mill levy on the assessed valuation of the taxable property within the school district. The state's contribution amounts to the difference between the school district's total program funding and the district's local share, although every district is entitled to receive a minimum level of state funding. School districts may supplement total program funding by an override election authorizing an additional mill levy.

---

1. In their complaint, plaintiffs also alleged that local school tax levies for education actually constitute state taxes subject to, and in violation of, the constitutional requirement of uniform taxation within tax districts. *See* Colo. Const art. I, § (1)(a). The trial court concluded that this court's decision in *Lujan*, 649 P.2d at 1021, precluded the plaintiffs' tax claim. The plaintiffs asked this court to review the trial court's ruling pursuant to C.A.R. 50, seeking a writ of certiorari before judgment by the court of appeals. We denied C.A.R. 50 review of the tax claim. *Lobato v. State*, No. 06SC598, 2006 WL 3005017 (Colo. Oct 23, 2006). The court of appeals did not consider the trial court's ruling on the tax issue, and the parties have not raised this issue to us in the current petition for certiorari, so we do not address it here.

2. *See, e.g.*, the Educational Accountability Act of 1971, §§ 22–7–101 to–107, C.R.S. (2009); Colorado Basic Literacy Act, §§ 22–7–501 to–507, C.R.S. (2009); Education Accreditation Act of 1998, §§ 22–11–101 to–105, C.R.S. (2009); Safe Schools Act, § 22–32–109.1, C.R.S. (2009); Accountability for Alternative Schools Act, § 22–7–604.5, C.R.S. (2009); English Language Proficiency Act, §§ 22–24–101 to–106, C.R.S. (2009); and the Colorado Commission on Higher Education, § 23–1–113, C.R.S. (2009).

Although plaintiffs do not allege that the state's funding of the PSFA fails to comply with statutory mandates, plaintiffs nevertheless allege that the state's current funding of the PSFA fails to meet the constitutional mandate of the education clause and that, as a result, school districts must use the override mechanism to attempt to meet the constitutional standard. Consequently, "property poor" school districts, which do not have the same capacity to generate funds through mill levies, are disproportionally deprived of the ability to meet their obligations under the education clause and education reform legislation. As further support for their inadequate funding claim, plaintiffs cite a statewide study conducted by the Colorado School Finance Project indicating that, in the 2001–02 school year, none of Colorado's 176 districts was able to raise and expend general operating funds at a level sufficient to meet the mandates of the education reform legislation, and that Colorado public schools were underfunded by at least $500 million. Plaintiffs assert that Colorado commits relatively little to education in comparison to other states. In 2004, Colorado ranked 49th out of the fifty states in primary and secondary education expenditures per $1,000 of personal income.[3]

Plaintiffs also claim that the PSFA total program funding level is arbitrary and irrational. They allege that the base amount and statutory increases, as set by the 1994 amendment to the PSFA, were determined on the basis of "historical spending levels and political compromise ... and not upon a valid

determination of the actual costs to provide every student with an opportunity for a constitutionally adequate, quality education, or to an education that meets the standards and goals mandated by education reform litigation and the Consolidated State Plan."[4] As further support for this claim, they allege that the state has not yet undertaken cost studies to determine the amount of resources that would be necessary to meet the "thorough and uniform" mandate or the standards set forth in the educational reform legislation and regulations.

In addition, plaintiffs allege that supplemental funding above the PSFA total program amount, intended to meet the needs of certain underserved and minority student populations, is insufficient and irrationally distributed. Plaintiffs claim that the state arbitrarily limits supplemental funding for eligible ELL students to a maximum of two years of funding per student,[5] without any basis to believe that two years is adequate. Further, they allege that the Colorado Department of Education distributed just 10.3 percent of the maximum statutory ELL allotment in 2003–04, without any rational basis to conclude that the level of funding was sufficient.

Plaintiffs also cite a 2000 study prepared for the State Board of Education, which found that the state's financial contribution to special education services was inadequate and that the funding formula relied too heavily on local taxation as a source of reve-

**3.** A recently released report by the United States Census Bureau, based on 2006–07 figures, found that Colorado remained ranked 49th in education expenditures per $1,000 of personal income. U.S. Census Bureau, *Public Education Finances 2007* 12 (2009), *available at* http://www2.census.gov/govs/school/07f33pub.pdf. This same report also found that Colorado ranked 40th in overall spending per pupil in 2007. *Id.* at xiii; *see also* Burt Hubbard, "Colo. at 40th in K–12 funds per student," *Denver Post,* at B–1 (July 28, 2009).

**4.** The Consolidated State Plan was adopted by the State Board of Education in order to comply with Colorado's obligations under the federal No Child Left Behind Act of 2001, 20 U.S.C. §§ 6301—6578 (2006). Like the standards-based education reform statutes recently passed by the

legislature, the Consolidated State Plan adopts certain education proficiency targets, objectives, and accountability measures.

**5.** *See* § 22–24–104(3), C.R.S. (2009). An amici curiae brief submitted by Padres Unidos and the Multicultural Education, Training & Advocacy, Inc. ("META") also argues that the two-year maximum for state supplemental ELL funding is arbitrary and has no basis in research. It cites to contrary evidence indicating that it takes four to seven years for ELL students to become proficient in English. *See, e.g.,* Kenji Hakuta, et al., *How Long Does It Take English Learners to Attain Proficiency? The University of California Linguistic Minority Research Institute Policy Report 2000–1* (2000), *available at* http://caselinks.education.ucsb.edu/casetrainer/CLADContent/Clad Language/node7/theory/HowLong.pdf.

nue.[6] In addition, plaintiffs detail alleged deficiencies and irrationalities in funding for underserved populations, including students from low-income families.

Lastly, plaintiffs claim that the state fails to provide constitutionally adequate funding for capital construction, particularly harming students residing in low property wealth districts. Plaintiffs allege that the amount allocated to the capital reserve fund under the PSFA formula is significantly less than the amount of capital expenses incurred by a school district. To make up the difference, plaintiffs state that school districts must contract for bond indebtedness, which is repaid by a local tax levy on real property within the district's boundaries. According to the complaint, property taxes yield widely disparate revenues per pupil across districts, ranging from $1.1 million of assessed value per pupil in one district to $13,027 of assessed value per pupil at the Sanford School District No. 6 in the San Luis Valley. Plaintiffs allege that forty percent of Colorado's school districts do not have sufficient bonding capacity to meet their capital needs and, therefore, cannot adequately meet the educational needs of their students or effectively exercise local control over instruction.

Plaintiffs sought a declaration from the trial court that the existing system of public school finance is unconstitutional under the education clause and the local control clause. Plaintiffs also sought an injunction compelling the state defendants to establish, fund, and maintain a thorough and uniform system of free public schools throughout the state. They asked that the court retain continuing jurisdiction over the matter until the state defendants complied with their constitutional obligations.

## B. The State Defendants' Response

The state defendants filed a motion to dismiss the plaintiffs' complaint pursuant to C.R.C.P. 12(b)(1) and 12(b)(5). They asserted that the plaintiff school districts, as political subdivisions of the state, lacked standing to challenge the adequacy of the education financing system on the basis of the local control clause. In addition, they argued that the plaintiffs raised a nonjusticiable political question because the adequacy of the school system and its funding mechanisms are matters committed wholly to the legislative branch, and they contend that the judiciary lacks manageable standards by which to resolve the issue. The state defendants further argued that plaintiffs' claims are precluded by Amendment 23, which the state defendants assert sets the constitutionally-minimum level of state funding required by the education clause.

## C. Trial Court Order

Without taking evidence, the trial court granted the state defendants' motion to dismiss pursuant to C.R.C.P. 12(b)(5), ruling that the plaintiffs failed to state a claim upon which relief could be granted. The court determined that Amendment 23 sets the minimum standards for educational funding and that the question of whether Amendment 23 levels of funding are adequate is a nonjusticiable political question which the General Assembly has the sole authority to answer. The court also ruled that the plaintiff school districts lacked standing to challenge the constitutionality of school financing, but did not address the plaintiff parents' standing.

## D. Court of Appeals' Decision

The court of appeals affirmed the trial court's ruling that the school districts lacked

---

**6.** Plaintiffs note that, in 2004–05, the state contributed fifteen percent of the total funding for special education services. The federal government provided an additional fifteen percent, and the remaining seventy percent was paid from school district general operating funds. According to the complaint, the seventy percent contribution from the school district general operating fund is more than double the national average of 32.2 percent from local general operating funds.

Although the plaintiffs' complaint was filed in 2004, adequate funding for special education services in Colorado remains an ongoing and con-

troversial issue. In July of this year, the Denver Post reported that complaints regarding the treatment of public school children with disabilities "may be increasing" as a result of insufficiently-trained staff and a lack of necessary funds. Karen Auge, "Without Funds, Colorado's Special Ed Often Can Fall Short," *Denver Post* (Jul. 13, 2009), *available at* http://www.denverpost.com/search/ci_12818543. According to the article, the State of Colorado ranks 51st in a field that includes the District of Columbia for its contribution to special education. *Id.*

standing. *Lobato,* 216 P.3d at 35. It also affirmed the trial court's holding that the plaintiffs' claims constituted a nonjusticiable political question. *Id.* at 35–41. As a preliminary matter, the court of appeals determined that *Lujan,* 649 P.2d 1005, a case in which this court evaluated the constitutionality of the state's public school financing system on the merits, did not establish the justiciability of the plaintiffs' claims. *Lobato,* 216 P.3d at 35–36. The court then applied the federal political question criteria developed in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) [7] and ultimately concluded that the plaintiffs presented nonjusticiable claims. *Lobato,* 216 P.3d at 35–42.

Applying *Baker,* the court of appeals first reviewed the text of the education clause, which states in relevant part that "The general assembly shall ... provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state...." *Id.* at 32 (quoting Colo. Const. art. IX, § 2). Based on this language, and citing the legislature's plenary authority over appropriations, *see* Colo. Const. art. V, § 32, the court of appeals concluded that the Colorado Constitution commits the issue of educational adequacy and financing solely to the legislature. *Lobato,* 216 P.3d at 37.

The court of appeals also reasoned that there were no judicially manageable standards to assess the constitutionality of the public school finance system. It asserted that judicial attempts to evaluate educational adequacy and financing would require excessive intrusion into questions of social policy and appropriations, both being questions constitutionally reserved for the legislature. *Id.* at 37–40.

Because the court found the plaintiffs' claims to be nonjusticiable under *Baker,* the court did not decide whether the claims were also precluded by Amendment 23. *Lobato,* 216 P.3d at 35.

The plaintiffs now seek review of the court of appeals' judgment on school district standing and justiciability.[8]

### III. Standard of Review

■■■ A motion to dismiss pursuant to C.R.C.P. 12(b)(5) tests the sufficiency of the complaint. *Pub. Serv. Co. of Colo. v. Van Wyk,* 27 P.3d 377, 385 (Colo.2001). A reviewing court must accept all averments of material fact as true and view the allegations in the light most favorable to the plaintiff. *Id.* at 385–86. The court cannot grant a motion to dismiss for failure to state a claim unless it appears beyond doubt that no set of facts can prove that the plaintiff is entitled to relief. *Id.; Dunlap v. Colo. Springs Cablevision, Inc.,* 829 P.2d 1286, 1291 (Colo.1992). Thus, at this stage we accept as true the plaintiffs' factual allegations.

### IV. School District Standing

■■■ We do not address the constitutional question of whether the school districts have standing. The court of appeals held sua sponte that the plaintiff parents possess standing, and neither the plaintiffs nor the defendants contest that holding on appeal.

---

**7.** *Baker* phrased the factors for identifying a nonjusticiable political question as follows:

> Prominent on the surface of any case involving a political question is [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pro-

nouncements by various departments on one question.

369 U.S. at 216, 82 S.Ct. 691.

**8.** We granted certiorari on the following two issues:

1. Whether the court of appeals erred in holding that claims regarding educational quality and adequacy of school funding brought pursuant to article IX, section 2 of the Colorado Constitution (the education clause) present nonjusticiable political questions.
2. Whether the court of appeals erred in holding that the school districts do not have standing to bring suit under article IX, section 15, of the Colorado Constitution (the local control clause) challenging the constitutionality of the Colorado system of public school finance.

Standing represents a challenge to the court's subject matter jurisdiction. Because we have subject matter jurisdiction due to the standing of the plaintiff parents, it is not necessary to address the standing of parties bringing the same claims as parties with standing. *See Mesa County Bd. of County Comm'rs v. State,* 203 P.3d 519, 526 n. 6 (Colo.2009). The plaintiff school districts raise the same claims as the individual plaintiff parents. The continued participation of the school districts in this case is similar to the role of permissive intervenors and does not require standing independent of plaintiffs with standing. *See N. Poudre Irr. Co. v. Hinderlider,* 112 Colo. 467, 475–76, 150 P.2d 304, 308–309 (1944) (quoting *SEC v. U.S. Realty & Imp. Co.,* 310 U.S. 434, 459, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940)). Therefore, the court need not evaluate the plaintiff school districts' standing provided that they raise claims identical to those of the plaintiff parents.[9] *See Crawford v. McLaughlin,* 172 Colo. 366, 370–71, 473 P.2d 725, 728 (1970); *In re Title, Ballot Title, Submission Clause, & Summary for 1999–2000 No. 215,* 3 P.3d 11, 14–15 (Colo.2000). Thus, the school districts may continue as plaintiffs in this case, and we reverse the judgment of the court of appeals on this issue.

## V. Justiciability

■ Next, we address the court of appeals' holding that claims regarding educational quality and adequacy of the state's public school financing system brought pursuant to the education clause, article IX, section 2 of the Colorado Constitution, present nonjusticiable political questions. We reverse the court of appeals and conclude that the issue is justiciable.

As a preliminary matter, we note that when Colorado became a state, public education was an important and prominent concern. The 1875 Enabling Act, which granted Colorado statehood, required as a precondition of admission to the Union that land be set aside "for the support of common schools." *See* 1875 Enabling Act, §§ 7, 14. The education clause, as it is worded today, has been part of the Colorado Constitution since statehood,[10] and states in relevant part: "The general assembly shall ... provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state, wherein all residents of the state, between the ages of six and twenty-one years, may be educated gratuitously." Colo. Const. art. IX, § 2.

■ The political question doctrine establishes that certain constitutional provisions may be interpreted and enforced only through the political process. Erwin Chemerinsky, *Interpreting the Constitution* 99–105 (1987). In Colorado, we have recognized that "[t]he judiciary's avoidance of deciding political questions finds its roots in the Colorado Constitution's provisions separating the powers of state government." *Colo. Common Cause v. Bledsoe,* 810 P.2d 201, 205 (Colo.1991) (citing Colo. Const. art. III). Because the court of appeals relied heavily on the federal political question doctrine as enunciated in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, we examine the *Baker* factors, the critique of *Baker* when applied to affirmative state constitutional rights such as the education clause, and the manner in which we have discussed *Baker* in our earlier precedent. This review, when combined with our analysis of *Lujan,* convinces us that the *Baker* test does not apply to this case. As we explain, we interpret *Lujan v. Colorado State Board of Education,* 649 P.2d 1005 (Colo.1982), as recognizing the authority of the judiciary to review whether the current funding system is constitutional.

We note that this court has cited or applied the *Baker* justiciability analysis only in rare circumstances. This court has never invoked this test to preclude judicial review of a statute's constitutionality. *See, e.g., Busse v. City of Golden,* 73 P.3d 660, 664

---

9. We note that if the plaintiff school districts were to inject novel issues into the case or otherwise invoke the court's subject matter jurisdiction, then the school districts would have to possess independent standing, and the trial court would evaluate the school district's standing.

10. *See Proceedings of the Constitutional Convention for the State of Colorado 1875–1876* 185 (Smith Brooks Press 1907).

(Colo.2003) (holding that an issue involving a city's discretion to spend bond proceeds was justiciable); *Meyer v. Lamm*, 846 P.2d 862, 872–73 (Colo.1993) (holding that challenge by write-in candidate to voting recount procedures presented a justiciable question); *Colo. Common Cause*, 810 P.2d at 201 (holding that whether the speech-and-debate clause granted legislators absolute immunity from certain suits was a justiciable question).

The federal political question doctrine, as articulated in *Baker*, has been subject to debate and criticism by leading scholars.[11] A major critique of the political question doctrine is that the *Baker* criteria "seem useless in identifying what constitutes a political question." Erwin Chemerinsky, *Federal Jurisdiction* 149 (5th ed.2007). "[T]here is no place in the Constitution," Professor Chemerinsky observes, "where the text states that the legislature or executive should decide whether a particular action constitutes a constitutional violation. The Constitution does not mention judicial review, much less limit it by creating 'textually demonstrable commitments' to other branches of government." Id. at 150. Moreover, the "most important constitutional provisions," including ones that courts have never hesitated to interpret, "are written in broad, open-textured language and certainly do not include 'judicially discoverable and manageable standards.'" *Id.; see also* Richard H. Fallon, Jr., *Judicially Man-*

*ageable Standards and Constitutional Meaning,* 119 Harv. L.Rev. 1274, 1275 (2006) (arguing that the Supreme Court's determination of what constitutes a judicially manageable standard is "so discretionary ... that if the requirement of judicial manageability was applied to the Court's own decisionmaking process ..., the criteria by which the Court identifies judicially unmanageable standards might themselves be disqualified as judicially unmanageable"); Martin Redish, *Judicial Review and the Political Question,* 79 Nw. U.L.Rev. 1031, 1045 (1985) (asserting that if "we were really to take seriously the 'absence-of-standards' rationale, then ... a substantial portion of all constitutional review is susceptible to the same critique").[12]

Scholars examining *Baker* also caution against mechanically applying the federal political question doctrine to state cases. Justice Brennan, who authored *Baker*, declared that "state courts that rest their decisions wholly or even partly on state law need not apply federal principles of standing and justiciability that deny litigants access to the courts." William J. Brennan, *State Constitutions and the Protections of Individual Rights,* 90 Harv. L.Rev. 489, 490–92 (1977); *see also* Helen Hershkoff, *State Courts and the "Passive Virtues": Rethinking the Judicial Function,* 114 Harv. L.Rev. 1834, 1940 ("[S]tate courts, because of their differing

---

11. *See, e.g.,* Erwin Chemerinsky, *Interpreting the Constitution* 99–105 (1987) (arguing that the political question doctrine, which allows for constitutional provisions to be interpreted and enforced only through the political process, is "inconsistent with the fundamental purpose of the Constitution: safeguarding matters from majority rule"); Martin Redish, *Judicial Review and the Political Question,* 79 Nw. U.L.Rev. 1031, 1059 (1985) (asserting that the political question doctrine is problematic because it allows the federal government or one of its branches to breach constitutional boundaries without the check of judicial review); Linda Sandstrom Simard, *Standing Alone: Do We Still Need the Political Question Doctrine?,* 100 Dick. L.Rev. 303 (1996) (arguing that, due to heightened standing requirements imposed by the Supreme Court in recent cases, the political question doctrine retains little or no independent purpose, and should be abolished).

12. We find the extensive criticism of the "judicially manageable standards" factor particularly

relevant as the court of appeals devoted a large portion of its justiciability analysis to this factor, ultimately concluding that no such standards exist to evaluate the constitutionality of the public school finance system. *See Lobato,* 216 P.3d at 37–39. The court of appeals is not unique in this regard; the absence of judicial standards is often relied on by courts to deny justiciability in education finance cases. *See, e.g., Neb. Coal. for Educ. Equity & Adequacy v. Heineman,* 273 Neb. 531, 731 N.W.2d 164, 176 (2007); *Coal. for Adequacy & Fairness in Sch. Funding, Inc. v. Chiles,* 680 So.2d 400, 402, 406–07 (Fla.1996); *Comm. for Educ. Rights v. Edgar,* 174 Ill.2d 1, 220 Ill. Dec. 166, 672 N.E.2d 1178, 1191 (1996); *see also* Christine O'Neill, *Closing the Door on Positive Rights: State Court Use of the Political Question Doctrine to Deny Access to Educational Adequacy Claims,* 42 Colum. J.L. & Soc. Probs. 545, 547 (2009) (noting that, of the states that have found education finance claims nonjusticiable, most have relied, in the author's view unjustifiably so, on *Baker's* absence-of-standards rationale).

institutional and normative position, should not conform their rules of access to those that have developed under Article III. Instead, state systems should take an independent and pragmatic approach to judicial authority in order to facilitate and support their integral and vibrant role in state governance."). The Supreme Court of Wyoming has expressly refused to apply the *Baker* factors in determining the justiciability of an educational adequacy case, relying instead on state constitutional principles and case law. *See State v. Campbell County Sch. Dist.*, 32 P.3d 325, 334–37 (Wyo.2001).[13]

Important differences exist between federal and state constitutional law on judicial power and the separation of powers. The federal courts are courts of limited jurisdiction. *Lujan*, 649 P.2d at 1017. The United States Constitution limits federal jurisdiction to "cases and controversies," *see* art. III, § 1, and federal district courts "possess jurisdiction only as conferred by Congress." Richard H. Fallon, Jr., Of *Justiciability, Remedies, and Public Law Litigation: Notes on the Jurisprudence of Lyons*, 59 N.Y.U. L.Rev. 1, 58 (1984).

In contrast to federal courts, Colorado district courts are courts of general jurisdiction. Colo. Const. art. VI, § 9. As we stated in *Lujan*, the Colorado Constitution is not one of limited powers where the state's authority is restricted to the four corners of the document. *Id.* at 1017. Colorado courts are common law courts and, as such, possess jurisdiction to construe the common law unless the General Assembly acts to the contrary. § 2–4–211, C.R.S. (2009). The common law of England, as it existed March 24, 1607, was adopted as the law of Colorado unless repealed or abrogated by the General Assembly. *See, People ex rel. Attorney Gen. v. News–Times Publ'g Co.*, 35 Colo. 253, 358–59, 84 P. 912, 945 (1906); *Vogts v. Guerrette*, 142 Colo. 527, 533, 351 P.2d 851, 855 (1960).

As such, Colorado courts have broader jurisdiction than their federal counterparts. *See, e.g.*, Hershkoff, *supra*, at 1888. In Colorado and several other states, courts may render advisory opinions on questions submitted by the legislature or executive. Note, *Advisory Opinions on the Constitutionality of Statutes*, 69 Harv. L.Rev. 1302, 1302–03 (1956); Colo. Const. art. VI, § 3. State courts also have a more accepted and established role in promulgating common law than federal courts. *See, e.g.*, Hershkoff, *supra*, at 1888–89; W. Hedges Robinson, Jr., "The Growth of the Judicial System in Colorado," in 2 *Colorado and Its People: A Narrative and Topical History of the Centennial State* 369, 382–83 (Leroy R. Hafen, ed., 1948) (recognizing the significant influence of Colorado state courts in the development of water law).

Rights enumerated in the United States Constitution have often been described as negative rights, recognizing only what areas the government cannot infringe upon. *See, e.g.*, *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (stating that the Due Process Clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security"); *Jackson v. City of Joliet*, 715 F.2d 1200, 1203 (7th Cir.1983) ("[T]he Constitution is a charter of negative rather than positive liberties. The men who wrote the Bill of Rights

**13.** Many other states examining the justiciability of education adequacy claims have also declined, although not explicitly, to apply the *Baker* factors. Instead, they have relied on their own education clauses, as well as state constitutional principles concerning separation of powers and judicial review, to determine the outcome of the justiciability question. *See, e.g.*, *Lake View Sch. No. 25 v. Huckabee*, 351 Ark. 31, 91 S.W.3d 472 (2002); *Vincent v. Voight*, 236 Wis.2d 588, 614 N.W.2d 388 (2000); *Abbeville County Sch. Dist. v. State*, 335 S.C. 58, 515 S.E.2d 535 (1999); *Abbott v. Burke*, 149 N.J. 145, 693 A.2d 417 (1997); *Leandro v. State*, 346 N.C. 336, 488 S.E.2d 249 (1997); *DeRolph v. State*, 78 Ohio St.3d 193, 677 N.E.2d 733 (1997); *Campaign for Fiscal Equity, Inc. v. State*, 86 N.Y.2d 307, 631 N.Y.S.2d 565, 655 N.E.2d 661 (1995); *Unified Sch. Dist. No. 229 v. State*, 256 Kan. 232, 885 P.2d 1170 (1994); *Idaho Schs. for Equal Educ. Opportunity, Inc. v. Evans*, 123 Idaho 573, 850 P.2d 724 (1993); *McDuffy v. Sec'y*, 415 Mass. 545, 615 N.E.2d 516 (1993); *Claremont Sch. Dist. v. Governor*, 138 N.H. 183, 635 A.2d 1375 (1993); *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186 (Ky.1989); *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979); *Seattle Sch. Dist. No. 1 v. State*, 90 Wash.2d 476, 585 P.2d 71 (1978).

were not concerned that the government might do too little for the people but that it might do too much to them." (internal citations omitted)). By contrast, many state constitutions contain the textual basis for affirmative rights, i.e., entitlements that the government must secure for its citizens. *See* Burt Neuborne, *State Constitutions and the Evolution of Positive Rights*, 20 Rutgers L.J. 881, 893–95 (1989) (listing examples of state constitutional provisions dealing explicitly with poverty, education, housing, shelter, and nutrition); William E. Thro, *The Role of Language in State Education Clauses in School Finance Litigation*, 79 Educ. L. Rep. 19, 19 (1993) (surveying state constitutional provisions and noting that every state's constitution, except for Mississippi's, expressly requires that some form of a free public education system be maintained). Because the negative rights guaranteed under the Federal Constitution differ from certain affirmative guarantees of state constitutions, state courts "engage . . . in substantive areas that have historically been outside the Article III domain." Hershkoff, *supra*, at 1888–89.

Keeping in mind the debate surrounding *Baker* and its applicability to state claims involving affirmative constitutional rights, we now consider the approach taken in *Lujan*, which recognized the authority of the judiciary to review whether the state's public school financing system that existed then was constitutional.

The *Lujan* plaintiffs, like the plaintiffs here, sought a ruling that Colorado's public school financing system was unconstitutional, but on educational equality grounds, as opposed to adequacy grounds.[14] *Lujan*, 649 P.2d at 1018. At the time of *Lujan*, the state's public school financing system relied on local tax revenues, but had, as it does now, an equalization program by which local revenues of poorer property districts were supplemented to some extent by state subsidies. *Id.* at 1012–13. The *Lujan* plaintiffs alleged that the system, because it was based in part on local revenues and resulted in spending disparities across the school districts, violated the equal protection clauses of the United States and Colorado Constitutions, as well as the education clause requirement that the state provide a "thorough and uniform" system of public schools. *Lujan*, 649 P.2d at 1010. In a plurality decision, the *Lujan* court rejected the plaintiffs' claims, finding that absolute equality in per-pupil expenditures was not required under either the Federal or State Constitutions. *Id.* at 1024, 1025. Nonetheless, the court stated that Colorado has "historically sought equality between the school districts, making a concerted effort to avoid any disparate impact upon the poor." *Id.* at 1021.

Central to *Lujan's* holding was its interpretation that the education clause contains a substantive mandate to the state subject to review by the courts. *Id.* The *Lujan* court found that the clause is "satisfied if thorough and uniform educational opportunities are available through state action in each school district" and "each school district must be given the control necessary to implement this mandate at the local level." *Id.; see also id.* at 1027 ("Stated simply, Art. IX, sec. 2 is a mandate to the State through the legislature to establish a complete and uniform system of public education for Colorado elementary and secondary school students.") (Erickson, J., specially concurring).[15] Although the *Lujan* court did not address the justiciability of the plaintiffs' claims explicitly, the court did state that the function of the judiciary is to "determine what the law is" and "rule on the constitutionality" of the state's public school financing system. *Id.* at 1025. Such a view

---

**14.** In *Lujan*, the plaintiffs were school children residing in sixteen of 181 school districts located within the state. 649 P.2d at 1010. Defendants were the Colorado State Board of Education and its members. *Id.* Twenty-six school districts intervened on the side of the defendants. *Id.* No districts intervened on behalf of the plaintiffs.

**15.** In a subsequent case, Justice Kourlis cited *Lujan* for the proposition that the education clause imposes a constitutional mandate. *See*

*Owens v. Colo. Cong. of Parents, Teachers & Students*, 92 P.3d 933, 947–48 (Colo.2004) (Kourlis, J., dissenting) ("In *Lujan* . . . we recognized that . . . the actions of the general assembly must be judged against its charge to provide a free and uniform system of public schools within each school district, and against whatever level of control is needed by the local school district to implement the state's mandate." (internal citations omitted)).

is consistent with our cases similarly holding that it is the province and duty of the judiciary to interpret the Colorado Constitution and say what the law is. *Colo. Gen. Assembly v. Lamm*, 704 P.2d 1371, 1378 (Colo.1985); *Bledsoe*, 810 P.2d at 206.

Because the *Lujan* plaintiffs challenged the system on equality grounds, not adequacy grounds, the court only briefly discussed what minimum level of educational opportunities would be necessary to meet the "thorough and uniform" standard. The court referenced a West Virginia case, *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979), which surveyed other states' interpretation of educational clauses "similar or identical to Colorado's 'thorough and uniform' requirement." *Lujan*, 649 P.2d at 1025 n. 23.[16] In addition, the court cited education statutes, most of which are still in effect in amended version today, passed by the General Assembly to "particularly implement" the mandate contained in the education clause. *See id.* at 1025; *see also id.* at 1018–19 (noting that is the constitutional responsibility of the legislature to "establish guidelines for a thorough and uniform system of public schools").

*Lujan* thus concluded that the General Assembly's own laws and pronouncements, as well as other courts' interpretations of similar state education clauses, can assist the court in assessing whether the General Assembly has adequately implemented the "thorough and uniform" mandate of the education clause.[17] In so doing, the court affirmed that the Colorado Constitution does not give the legislature unfettered discretion in this area and that the court has the responsibility to review whether the actions of the legislature are consistent with its obligation to provide a thorough and uniform public school system.

Despite *Lujan's* explicit pronouncement that the court's "function is to rule on the constitutionality of our state's system" of public education, 649 P.2d at 1025, the court of appeals concluded that such scrutiny of the state's public school financing system would be inconsistent with the separation of powers doctrine. The court of appeals was obligated to follow *Lujan*, which it failed to do. Hence, we reverse that court's holding on this point.

█ Article III of the Colorado Constitution equally divides the powers of government between the executive, legislative, and judicial branches. *See Pena v. Dist. Court of Second Judicial Dist.*, 681 P.2d 953, 956 (Colo.1984). The three branches "shall cooperate with and complement, and at the same time act *as checks and balances against one another* but shall not interfere with or encroach on the authority or within the province of the other." *Smith v. Miller*, 153 Colo. 35, 40–41, 384 P.2d 738, 741 (1963) (emphasis added). A ruling that the plaintiffs' claims are nonjusticiable would give the legislative branch unchecked power, potentially allowing it to ignore its constitutional responsibility to fashion and to fund a "thorough and uniform" system of public education.

█ The court of appeals asserted that to decide the plaintiffs' case on the merits would "present a substantial risk of judicial intrusion" into the General Assembly's power of appropriations. *Lobato*, 216 P.3d at 40. While we acknowledge that the General As-

---

**16.** Justice Erickson, whose concurring vote was necessary to the ultimate disposition of *Lujan*, also relied on out-of-state jurisdictions to define the meaning of the "thorough and uniform" clause. In doing so, he incorporated the following language from the Washington Supreme Court, whose state has a constitutional provision similar to Colorado's education clause:

> A general and uniform system, we think, is, at the present time, one in which every child in the state has free access to certain minimum and reasonably standardized educational and instructional facilities and opportunities to at least the 12th grade ... and with access by each student of whatever grade to acquire

those skills and training that are reasonably understood to be fundamental and basic to a sound education.

*Lujan*, 649 P.2d at 1028 (Erickson, J., specially concurring) (quoting *Northshore Sch. Dist. v. Kinnear*, 84 Wash.2d 685, 530 P.2d 178, 202 (1975)).

**17.** Since *Lujan*, the General Assembly has enacted additional education reform statutes with proficiency targets and content standards, which the plaintiffs in this case assert, and we agree, may also be used to help evaluate the constitutionality of the legislature's actions.

sembly "enjoys broad legislative responsibility ... to raise and spend funds for government purposes.... [T]his general authority must be exercised in conformity with express or implied restraints imposed thereon by specific constitutional provisions." *Dempsey v. Romer*, 825 P.2d 44, 51 (Colo.1992); *see also Colo. Ass'n of Pub. Employees v. Lamm*, 677 P.2d 1350, 1353 (Colo.1984); *People v. Y.D.M.*, 197 Colo. 403, 593 P.2d 1356 (1979). To this end, we have regularly adjudicated claims that the legislature's appropriations power is being exercised outside of constitutional limits. *See, e.g., Barber v. Ritter*, 196 P.3d 238 (Colo.2008) (deciding, on the merits, whether the legislature's transfer of money from special cash funds to the General Fund violated article X, section 20 of the Colorado Constitution).[18]

As discussed, *Lujan* explicitly recognized that the legislature is constitutionally mandated to implement a "thorough and uniform" system of public education. 649 P.2d at 1025. This mandate imposes a judicial constraint, or check, on the legislature's general appropriations power, giving the court the authority to review the merits of the plaintiffs' claims.

The scope of the court's review in this area, however, is limited. As *Lujan* explains, "whether a better financing system could be devised [by the legislature] is not material ... as our sole function is to rule on the constitutionality of our state's system." 649 P.2d at 1025.[19] In its analysis of the plaintiffs' claims under Colorado's equal protection clause, the *Lujan* court specifically

warned against excessive judicial involvement in education policy:

> While our representative form of government and democratic society may benefit ... from a public school system in which each school district spends the exact [same] dollar amount per student with an eye toward providing identical education for all, these are considerations and goals which properly lie within the legislative domain. Judicial intrusion to weigh such considerations and achieve such goals must be avoided.

*Id.* at 1018. While the *Lujan* court went on to decide the plaintiffs' claims on the merits, it applied the minimally-intrusive standard of rational basis review to the plaintiffs' equal protection claims, inquiring into whether the state's public school financing system rationally furthered a legitimate state purpose. *Id.* at 1022.

Applying this standard of review, the *Lujan* court found that a legitimate state purpose of the state's public school financing system was local control over educational instruction and that this purpose was rationally furthered by the use of local taxes. *Id.* at 1022–23. This system gave school districts the freedom to devote more money to education than the state-guaranteed minimum amount of funding. *Id.* The court recognized that, as a consequence of the system, the lower property wealth districts had less fiscal control than the wealthier ones. That result, by itself, was not enough to render the funding scheme unconstitutionally discriminatory under the equal protection clause, as there was no requirement that the

---

**18.** A brief submitted by the Colorado Lawyers Committee and the Colorado Center on Law and Policy directs our attention to a litany of additional cases where this court has adjudicated claims implicating the General Assembly's authority over appropriations, including cases where the court ultimately required an additional expenditure of state funds. *See, e.g., Indus. Claim Appeals Office v. Romero*, 912 P.2d 62 (Colo.1996) (adjudicating, on the merits, plaintiffs' claim that statute limiting workers' compensation benefits to those under age 65 violated equal protection rights); *Dempsey v. Romer*, 825 P.2d 44 (Colo.1992) (evaluating whether a statute setting maximum monthly salary levels for state employees violates constitutional protections); *Colo. Gen. Assembly v. Lamm*, 738 P.2d 1156 (Colo.1987) (determining whether the General

Assembly had the authority to appropriate federal block grant funds without veto by the Governor).

**19.** Other state courts deciding school funding challenges have similarly declared that "the proper scope of our review is limited to determining whether the current system meets constitutional muster." *DeRolph v. State*, 78 Ohio St.3d 193, 677 N.E.2d 733, 747 n. 9 (1997); *see also Neeley v. West Orange–Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 777 (Tex.2005) ("[T]he legislature has the sole right to decide *how* to meet the [constitutional] standards ..., and the Judiciary has the final authority to determine *whether* they have been met.").

scheme effectuate the state's goals perfectly. *Id.*

The *Lujan* court also applied rational basis scrutiny to evaluate the constitutionality of statutory provisions limiting a locality's ability to raise funds for educational purposes. These provisions, similar to the capital construction limits at issue in this case, tied the outer limit on the amount of money a municipality could raise to the taxable valuation of property within each school district. The court concluded that the provisions were rationally related to the legitimate state purpose of controlling the public debt and were constitutional. *Id.* at 1023–24.

When it reviewed the rationality of the state's public school financing system, taking into account the state's goals of local control and minimizing the public debt, the *Lujan* plurality satisfied its constitutional obligation to "determine what the law is," without usurping the legislature's authority over education policy.[20] *Id.* at 1025.

■■ Hence, we hold that the judiciary must similarly evaluate whether the current state's public school financing system is funded and allocated in a manner rationally related to the constitutional mandate that the General Assembly provide a "thorough and uniform" public school system. This rational basis review satisfies the judiciary's obligation to evaluate the constitutionality of the public school system without unduly infringing on the legislature's policymaking authority. The court's task is not to determine "whether a better financing system could be devised," *Lujan,* 649 P.2d at 1025, but rather to determine whether the system passes constitutional muster.

The *Lujan* court engaged in rational basis review of whether the state's system, which provided for revenue differences between the districts, violated the "thorough and uniform" mandate. *See id.* at 1024–26. We see no reason to devise a different standard of review in this case, where the plaintiffs also assert substantive claims under the same constitutional provision. Here, plaintiffs allege that the PSFA base funding amount and statutory increases are based on "historical compromise," as opposed to a rational determination of the amount it would cost to implement the "thorough and uniform" mandate or the cost of providing an education that meets the standards and goals mandated by education reform efforts. Citing an independent cost study, plaintiffs allege that the current funding levels do not allow students the opportunity to meet the standards and objectives established in education reform legislation. In addition, plaintiffs allege that funding for underserved student populations and capital construction is insufficient and irrationally dependent on local property taxes. Plaintiffs further allege that the state's public school financing system is unconstitutionally irrational because it prevents the district from implementing the education clause mandate at a local level.

In sum, plaintiffs allege that the state's public school financing system is unconstitutional because it is underfunded and disburses funds on an irrational and arbitrary basis in violation of the "thorough and uniform" mandate. In an appropriate case, as was the case in *Lujan,* our courts have the responsibility to review the state's public school funding scheme to determine whether this system is rationally related to the General Assembly's constitutional mandate to provide a "thorough and uniform" system of public education. Hence, plaintiffs' constitutional challenges to Colorado's public financing scheme present appropriate claims and are justiciable.

■■ The plaintiffs are entitled to the opportunity to prove their allegations. To be successful, they must demonstrate that the school finance scheme is not rationally related to the constitutional mandate of a "thorough and uniform" system of public education. The trial court must give significant

**20.** We note that there have been substantial changes in the PSFA since *Lujan* was decided in 1982. Much of this detail is discussed in *Mesa County Board of County Commissioners v. State,* 203 P.3d 519, 525–26 (Colo.2009). For example, the state's share of funding for the public school

total program has risen significantly from 43 percent in 1982 to 64 percent in 2007, while the local school districts' share decreased from 47 percent to 36 percent over the same period of time. *See Lujan,* 649 P.2d at 1011; *Mesa County Bd. of County Comm'rs,* 203 P.3d at 525.

deference to the legislature's fiscal and policy judgments. The trial court may appropriately rely on the legislature's own pronouncements to develop the meaning of a "thorough and uniform" system of education. If the court finds that the current system of public finance is irrational, then the court must provide the legislature with an appropriate period of time to change the funding system so as to bring the system in compliance with the Colorado Constitution.[21] *Evans*, 482 P.2d at 972.

## VI. Amendment 23

■ The state defendants assert that Amendment 23, put in context, sets the constitutionally minimum level of state funding required by the education clause, and therefore, the plaintiffs do not present a justiciable question. The trial court agreed, finding that Amendment 23 "clearly mandates a minimum level of state education funding," and that the levels dictated by Amendment 23 are "consistent with the goals of the education clause." It ruled that the question of whether Amendment 23 levels of funding are adequate is a political question to be decided by the legislature and the voters. We disagree with this interpretation of Amendment 23.

■ When construing a constitutional amendment, the duty of the court is to "give effect to the electorate's intent in enacting the amendment." *Zaner v. City of Brighton*, 917 P.2d 280, 286 (Colo.1996). Words must "be given the natural and popular meaning usually understood by the people who adopted them." *Urbish v. Lamm*, 761 P.2d

756, 760 (Colo.1988). If the intent of the electorate is not clear from the language of an amendment, "courts should construe the amendment in light of the objective sought to be achieved and the mischief to be avoided by the amendment." *Zaner*, 917 P.2d at 286 (citing *People in Interest of Y.D.M.*, 197 Colo. 403, 407, 593 P.2d 1356, 1359 (1979)). In doing so, courts may consider other relevant materials such as the "Blue Book," an analysis of ballot proposals prepared by the Legislative Council. *Davidson v. Sandstrom*, 83 P.3d 648, 655 (Colo.2004). Evidence of the "contemporary interpretation of those actively promoting the amendment" may also be given weight. *Bedford v. Sinclair*, 112 Colo. 176, 182, 147 P.2d 486, 489 (1944).

Amendment 23 was adopted by voter initiative in 2000. By its plain terms and as described in the Blue Book, Amendment 23 increases per-pupil funding and funding for categorical programs by a minimum rate of inflation plus one percentage point until the fiscal year 2010–11, and thereafter by at least the rate of inflation. Colo. Const. art. IX, § 17(1). Amendment 23 also requires that total state aid provided through the PSFA increase by at least five percent annually. *Id.* § 17(5). To finance the increased revenue demands, Amendment 23 requires that the state divert a portion of tax collections to a state education fund exempt from the revenue and spending limits of article X, section 20 of the Colorado Constitution. *Id.* § 17(4).

While the Blue Book accurately explains that Amendment 23 "sets a minimum increase in funding,"[22] nowhere does it refer to

---

**21.** Other state courts that have found their school funding scheme constitutionally inadequate allowed the legislature time to develop the proper remedy. *See, e.g., DeRolph,* 677 N.E.2d at 747 (staying the effect of its decision for twelve months to give the legislature time to establish a new education funding system); *Claremont Sch. Dist. v. Governor,* 142 N.H. 462, 703 A.2d 1353, 1360 (1997) (staying proceedings until the end of the upcoming legislative session to permit the legislature to address the issues involved); *Rose v. Council for Better Educ., Inc.,* 790 S.W.2d 186, 216 (Ky.1989) (withholding finality of its decision for ninety days after the legislative session to give the General Assembly time to "recreate a new statutory system of common schools"). These state courts have explicitly recognized that it is

the task of the legislature, and not the judiciary, to bring the education funding system into constitutional compliance. *See, e.g., Montoy v. State,* 278 Kan. 769, 120 P.3d 306, 310 (2005) ("[T]here are many ways to re-create or reestablish a suitable financing formula. We do not dictate the precise way in which the legislature must fulfill its constitutional duty. That is for the legislators to decide, consistent with the Kansas Constitution."); *DeRolph,* 677 N.E.2d at 747 n. 9 ("We refuse to encroach upon the clearly legislative function of deciding what the new legislation will be.").

**22.** An amicus curiae brief submitted by Great Education Colorado in support of plaintiffs notes that an earlier draft of the Blue Book language

the education clause, or the terms "thorough," "uniform," or "adequate." The Blue Book summarized proponents' arguments in favor of Amendment 23 as seeking to reverse the decline of funding for education, which began after the adoption of constitutional limitations on state revenue and spending. Proponents did not suggest that the amendment would suffice to fund the minimum level of educational opportunities to all students as required by the education clause.

As we have shown, Amendment 23 prescribes minimum increases for state funding of education. It was not intended to qualify, quantify, or modify the "thorough and uniform" mandate expressed in the education clause, which *Lujan* recognized as an appropriate subject of judicial review. Consequently, the Amendment 23 mandate relates solely to a minimum level of funding. It neither relates to nor concerns the "thorough and uniform" mandate in the education clause and, therefore, does not affect our holding that the plaintiffs present a justiciable claim for relief.

## VII. Conclusion

For the reasons stated above, the court of appeals' judgment is reversed, and we remand this case to the court of appeals to be returned to the trial court for proceedings consistent with this opinion.

Justice RICE dissents, and Justice COATS and Justice EID join in the dissent.

Justice RICE dissents.

The Colorado Constitution directs the General Assembly to "provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state," placing discretionary education questions in Colorado squarely and solely within the legislative ambit. Colo. Const. art. IX, § 2. That language, however, does not completely foreclose any judicial review of education in Colorado, but it does implicate the political question doctrine and

its constraints on justiciability. *See Lujan v. Colo. State Bd. of Educ.*, 649 P.2d 1005, 1025 (Colo.1982).

Therefore, I believe this court should adopt the United States Supreme Court's framework defining the parameters of the political question doctrine and apply it to this issue. *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Moreover, having reviewed this case through the lens of *Baker*, I am convinced that, despite the vital role that public education plays in our state, this court should not exercise its jurisdiction and determine what constitutes a "thorough" education. The majority's efforts to do so result in its flawed attempt to affix an untested, undefined, and unlimited rational basis review to all education claims.

For that reason, I respectfully dissent from the majority opinion regarding justiciability and would hold this issue not appropriate for judicial review.

## I. The Political Question Doctrine

The political question doctrine traces its roots to the earliest days of the judiciary, when the Court struggled to define its role and level of oversight of the executive and legislative branches. *See generally Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). At the time, although the Supreme Court unambiguously stated that it had the power to interpret the law, Chief Justice Marshall noted that without the restraints imposed by the political question doctrine, "[t]he division of power ... could exist no longer, and the other departments would be swallowed up by the judiciary." Speech of the Honorable John Marshall (Mar. 7, 1800), *in* 18 U.S. (5 Wheat.) app. n. I, at 16 (1820).

Such a view remains compelling today. The United States Supreme Court noted as recently as 2004 that, although *Marbury*, 5 U.S. at 177, plainly gives the courts the "province and duty ... to say what the law

---

stated that "the state constitution sets *the* minimum increase in funding," whereas the final language stated that Amendment 23 "sets *a* minimum increase in funding." (emphasis added). They argue, and we are inclined to agree, that

this supports an interpretation that the education clause could require a greater level of funding, if necessary to satisfy the "thorough and uniform" mandate, than is prescribed under Amendment 23.

is;" "[s]ometimes, however, the law is that the judicial department has no business entertaining the claim of unlawfulness-because the question is entrusted to one of the political branches or involves no judicially enforceable rights." *Vieth v. Jubelirer*, 541 U.S. 267, 277, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (plurality opinion) (citations omitted).

This court too has recognized the political question doctrine, maintaining the position that "the resolution of [political questions] should be eschewed by the courts." *Colo. Gen. Assembly v. Lamm*, 704 P.2d 1371, 1378 (Colo.1985); *see also Colo. Common Cause v. Bledsoe*, 810 P.2d 201, 205–06 (Colo.1991).[1] Adopting the federal rationale within the framework of laws governing this state, we have observed:

> The judiciary's avoidance of deciding political questions finds its roots in the Colorado Constitution's provisions separating the powers of state government, *see* e.g., Colo. Const. art III, and recognizes that certain issues are best left for resolution by the other branches of government, or 'to be fought out on the hustings and determined by the people at the polls.'

*Colo. Common Cause*, 810 P.2d at 205 (quoting *People ex rel. Tate v. Prevost*, 55 Colo. 199, 212, 134 P. 129, 133 (1913)).

In 2003, we renewed our position that the political question doctrine applies in this state, declaring that "courts must refrain from reviewing controversies concerning policy choices and value determinations that are constitutionally committed for resolution to the legislative or executive branch...." *Busse v. City of Golden*, 73 P.3d 660, 664 (Colo.2003) (citing *Baker*, 369 U.S. at 217, 82

S.Ct. 691 and rephrasing the first *Baker* factor). This strong endorsement stands as our most recent treatment of the doctrine.

Thus, our own precedent demands that this court adhere to the constraints of the political question doctrine, and it should not be ignored or minimized as applied to this case. Indeed, the political question doctrine is not some novel theory plucked from the outskirts of jurisprudence; it is a core tenet of this state's judiciary rooted directly in the Colorado Constitution.

It is for this reason that I take issue with the majority's attempt to minimize this court's history of applying the political question doctrine by stating that the doctrine has never yielded a finding of nonjusticiability when applied. It is important to differentiate between the very existence of the doctrine—and, in turn, the majority's apparent calls for abandonment of the doctrine outright—and the application of the doctrine. *See* maj. op. at 369 n.11, 371. Indeed, without explicitly stating its aims, the majority seems to be arguing for an absolute rejection of the political question doctrine and its self-imposed check on judicial decision-making.[2] Furthermore, not only does the majority apparently reject the doctrine, but it offers no workable standard with which to replace it, leaving the courts without any justiciability framework and judges unclear whether the concept still exists in Colorado jurisprudence.

It is and should remain this court's practice to consider the justiciability of questions brought before it. I would not abandon years of both federal and Colorado jurispru-

---

1. It is important to distinguish between subject matter jurisdiction and justiciability in this area. As the United States Supreme Court noted, "there is a significant difference between determining whether a ... court has 'jurisdiction of the subject matter' and determining whether a cause over which a court has subject matter jurisdiction is 'justiciable.'" *Powell v. McCormack*, 395 U.S. 486, 512, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). Thus, it remains possible and proper for this court to conclude that dictating what is an *adequate* education for the state's children is a nonjusticiable political question, despite *Lujan* and prior court findings of subject matter jurisdiction in the *topic* of education.

2. In addressing the doctrine, the majority never states its purpose for citing a narrow collection of scholars—but not courts—criticizing the doctrine, leaving the reader to guess at the majority's reason for inclusion. One could interpret this silence as either an abandonment of the political question doctrine writ large or a more limited refusal to apply *Baker* to decide political questions. The former would leave this state vulnerable to unchecked judicial decision-making in political issues, while the latter would simply cause a reversion to the "seeming disorderliness" in the doctrine that the Supreme Court remedied in *Baker*. 369 U.S. at 210, 82 S.Ct. 691. Neither option is viable.

dence respecting the political question doctrine as a valuable check on otherwise unrestrained judicial decision-making. Common sense combined with stare decisis militate in favor of preserving the doctrine and applying it when appropriate.

## II. Application of the *Baker* Factors

After discussing the merits of the political question doctrine, this court in *Colorado Common Cause* employed the *Baker* framework to determine justiciability. We should use the same approach in this case.[3]  *Colo. Common Cause*, 810 P.2d at 205–06. The *Baker* factors, as adopted in *Colorado Common Cause*, focus the application of the political question doctrine into a workable and understandable formula, thereby limiting misapplication and "exposing the attributes" of the doctrine. *Baker*, 369 U.S. at 210, 82 S.Ct. 691. It should also be noted that, after some years where the Court rarely employed *Baker*, the Supreme Court recently both reaffirmed *Baker's* vitality and clarified its factors or "tests." *Vieth*, 541 U.S. at 277, 124 S.Ct. 1769.

Specifically, the *Baker* court held that any one of the following six factors could sustain a finding of nonjusticiability:

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made;

or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217, 82 S.Ct. 691. In conjunction with its goals of narrowing and focusing the scope of the doctrine, the Court stressed that a court should dismiss a case if any one of the factors become "inextricable from the case at bar." *Id.* Thus, the presence of any factor makes a case nonjusticiable. Although all six each suggest that the issue before us is not justiciable, I will discuss the first four factors in greater depth.

### A.  A Demonstrable Textual Constitutional Commitment of the Issue to a Coordinate Political Department

In considering this first factor, the Supreme Court noted that:

Deciding whether a matter has in any measure been committed by the Constitution to another branch of government … is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution. To demonstrate this requires no less than to analyze representative cases and to infer from them the analytical threads that make up the political question doctrine.

*Baker*, 369 U.S. at 211, 82 S.Ct. 691.

Therefore, in weighing the first factor we must look to both the exact constitutional language in question and to the prior cases which offer an interpretation of that language. The constitutional language controlling this issue reads: "The general assembly shall, as soon as practicable, provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state...." Colo. Const. art. IX, § 2.[4] Thus, on its face, the plain language

---

3. While questioning the use of *Baker,* the majority cites broad statements supporting the canon that allows state courts of general jurisdiction to impose separate justiciability standards from federal standards. *See, e.g.,* William J. Brennan, *State Constitutions and the Protections of Individual Rights,* 90 Harv. L.Rev. 489, 490–92 (1977) ("[S]tate courts that rest their decisions wholly or even partly on state law need not apply federal principles of standing and justiciability that deny litigants access to the courts."). The fact that this is a court of general jurisdiction that need

not employ *Baker* is not at issue, but I believe the *Baker* factors represent a logical and established standard for determining justiciable political questions. This court would be wise to continue using them today.

4. Because I find this question nonjusticiable based upon the constitutional commitment in article IX, I find it unnecessary to delve into the more murky interpretive argument posed by defendants regarding amendment 23.

"the general assembly shall" controls the argument, and a review of precedent supports this conclusion. *See, e.g., Washington County Bd. of Equalization v. Petron Dev. Co.,* 109 P.3d 146, 149 (Colo.2005).

Moreover, our precedent in *Lujan* strongly suggests that this issue is constitutionally committed to the General Assembly. Interpreting the same "thorough and uniform education" clause at issue today, we held:

> While it is clearly the province and duty of the judiciary to determine what the law is, the fashioning of a constitutional system for financing elementary and secondary public education in Colorado is not only the proper function of the General Assembly, but this function is expressly mandated by the Colorado Constitution.

*Lujan,* 649 P.2d at 1025 (citing *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); Colo. Const. art. IX, § 2).

In short, the plain language of the constitutional provision coupled with our precedent strongly suggest that the issue before us has been constitutionally committed to the legislative branch.

## B. A Lack of Judicially Discoverable and Manageable Standards for Resolving the Case

I turn now to the second *Baker* factor, namely whether there are any judicially manageable standards by which to resolve the issue presented. This factor is closely tied to the first, as the Supreme Court has observed that, "the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." *Nixon v. United States,* 506 U.S. 224, 228–29, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993). Such standards and rules are conspicuously absent in this case.

Furthermore, our holding in *Lujan* offers no standards or rules that would be of assistance here because our holding in *Lujan* only applied to an equal protection claim. *Lujan,* 649 P.2d at 1011, 1024–25. Even though the *Lujan* plaintiffs made two distinct claims—one a classic equal protection challenge and the other under the "thorough and uniform" clause—the *Lujan* court spent the majority of its opinion reasoning that education was not a fundamental right nor was wealth a suspect classification, both of which are equal protection analyses. *See id.* at 1014–22. Those two determinations led the court to conclude that a rational basis standard should apply, resulting in a holding that the school funding system at the time was "rationally related to the legitimate state purpose of controlling the public debt." *Id.* at 1024. Because that holding and the use of the rational basis standard responded only to a traditional equal protection argument, it has no controlling effect on today's issue.

The *Lujan* court then turned to the purely Colorado constitutional claim that unequal per pupil spending violated the "thorough and uniform" clause. *Id.* at 1024–25. *Lujan,* however, only defined what the constitution does *not* require, specifically uniform and equalized spending per pupil. In support of its ruling that only "uniform educational *opportunities*" must be available, the *Lujan* court merely cited instances where this court had interpreted aspects of the education clause in response to discrete issues demanding "yes" or "no", "constitutional" or "unconstitutional" answers. *Id.* at 1025 (emphasis added).[5] Thus, this court issued no prospective rule, only basic reasoning through analogy, leaving nothing to guide or bind future courts.

The majority refers to *"Lujan's* explicit pronouncement that the court's 'function is to rule on the constitutionality of our state's system' of public education," but the majority fails to recognize the context surrounding

---

**5.** It is important to note that the cases cited in the *Lujan* decision each demanded concise answers to straightforward questions. *See, e.g., Marshall v. Sch. Dst. Re No. 3 Morgan County,* 191 Colo. 451, 553 P.2d 784 (1976) (holding that "uniform" does not require equal spending on textbooks); *Duncan v. People ex rel. Moser,* 89

Colo. 149, 299 P. 1060 (1931) (holding the uniform provision does require a public high school education in every district). Analogizing to this line of succinct answers to education questions, the *Lujan* court both found the question presented justiciable and issued its basic holding. *See Lujan,* 649 P.2d at 1024–25.

that uncontested principle. Maj. op. at 372 (citing *Lujan*, 649 P.2d at 1025). In its entirety, the quoted sentence reads: "Thus, whether a better financing system could be devised is not material to this decision, as our sole function is to rule on the constitutionality of our state's system." *Lujan*, 649 P.2d at 1025. Plaintiffs today ask the court to decide not on a constitutional question but, almost verbatim, on "whether a better financing system could be devised." [6] *Id*. *Lujan* neither controls this case nor sanctions review of all claims brought under the education clause. It actually states the opposite, maintaining that financing decisions are instead "the proper function of the General Assembly." *Lujan*, 649 P.2d at 1025.

Moreover, the majority states that in *Lujan* "the court affirmed ... that [it] has the responsibility to review whether the actions of the legislature are consistent with its obligation to provide a thorough and uniform public school system." Maj. op. at 372. Again, this is a misreading of the *Lujan* opinion, and it is instructive only as evidence of the majority's conflation of *Lujan's* separate equal protection and "thorough and uniform" holdings.

The majority writes that "[t]he *Lujan* court engaged in rational basis review of whether the state's system ... violated the 'thorough and uniform' mandate." Maj. op. at 374. This is simply untrue-the *Lujan* court never references any test for "thorough and uniform," uses the words "rational basis," or posits any standard of review. *See Lujan*, 649 P.2d at 1024–25. Indeed, the majority offers no support for its statement that rational basis review applies here.[7] Stated succinctly, the *Lujan* holding on the education clause rested solely on prior decisions, all of which involved discrete "yes" or "no" answers considerably different from the abstract one presented in this case.

On the other hand, the plaintiffs today ask this court to define an "adequate" or "thorough" education in this state, but this intangible concept is ill-fitted for a judicial rule. Plaintiffs ask:

> [T]hat this Court enter judgment declaring that the education clause guarantees to each school age resident of the state the right to a public education sufficient to permit him or her to participate meaningfully in the civic, political, economic, social, and other activities of our society and the world, and to exercise the basic civil and other rights of a citizen of the State of Colorado and the United States of America. This is the "constitutionally adequate, quality education" that must be established and maintained—and must be funded in order to be more than an empty promise.

Pet'r Reply Br. 14. Plaintiffs attempt to constrain this request by directing the courts to defer all specific decisions to the General Assembly, but, as other state courts have found, such a partitioning of responsibilities is not workable in reality. Pet'r Br. at 80; *See, e.g., infra* n.10 (describing the New Jersey courts' attempts to manage education from the bench).

The central feature of a "judicially manageable standard" is a logical framework that can guide future courts. *Vieth*, 541 U.S. at 278, 124 S.Ct. 1769 ("judicial action must be governed by *standard*, by *rule*") (emphases in original). It is impossible to create a judicial standard or rule that can define, accommodate, and limit the enormity of preparing students for meaningful "civic, political, economic, social" engagement in the world. The majority's attempts to affix a rational basis standard to a nebulous concept like this do not present a manageable framework, and the standard fails to inform or channel judicial discretion.

---

**6.** Specifically, plaintiffs demand this court devise a standard of adequate funding, which they define to mean "funding sufficient to assure that every school child will have a meaningful opportunity to access a course of study designed and sufficient to fulfill the requirements of the Education Clause, supported by necessary teachers, administrators, support personnel, learning materials, and facilities." Pet'r Reply Br. 2. Such an unbound request for judicial oversight quite

simply exceeds the bounds of a constitutional review by this court and instead demands a new, court-imposed financing system.

**7.** It is assumed that the majority borrows the standard from the equal protection discussion in the immediately preceding pages; otherwise, there exists absolutely no explanation for a rational basis standard in this context.

Such an unbound standard of review simply substitutes the trial court for the General Assembly, essentially giving the trial court veto power over any legislative policy determination in education. I believe such a breach of the separation of powers is unacceptable. The majority's rational basis concept does not represent the requisite "judicially manageable standard."

Finally, I believe that this court is not in a position to devise a judicially manageable standard on which to evaluate the adequacy or thoroughness of an education. There is no precedent to guide our hand in fashioning a standard, creating the unacceptable appearance of an arbitrary judicial decree. In *Lujan*, we recognized that:

> We have never been called upon to interpret article IX, section 2 [the "thorough and uniform" clause] in any context which would prove helpful to this case although the provision is discussed in many cases. Also, we are unable to find any historical background to glean guidance regarding the intention of the framers.

*Lujan*, 649 P.2d at 1024–25 (citations omitted).

The lack of any constitutional or judicial history to guide our interpretation distinguishes this case from other state cases that have created educational standards from the bench. As the court of appeals correctly observed, "the contours of a 'quality' public education cannot be ascertained by judicially discoverable or manageable standards because the education clause 'provides no principled basis for a judicial definition.'" *Lobato*, 216 P.3d at 39 (quoting *Comm. For Educ.*

*Rights v. Edgar*, 174 Ill.2d 1, 220 Ill.Dec. 166, 672 N.E.2d 1178, 1191 (Ill.1996)).[8]

In addition, we have already held that the education clause itself "mandates the General Assembly to provide to each school age child the opportunity to receive a free education, *and to establish guidelines* for a thorough and uniform system of public schools." *Lujan*, 649 P.2d at 1018–19 (emphasis added). Thus, we have already assigned to the General Assembly the responsibility to create and impose broad education policy determinations. It would be a marked transgression for this court to now usurp the role it has already designated to the legislature in *Lujan* by attempting to devise new standards for education.

## C. The Impossibility of Deciding the Case Without an Initial Policy Determination of a Kind Clearly for Nonjudicial Discretion

We have consistently held that "courts must avoid making decisions that are intrinsically legislative. It is not up to the court to make policy or to weigh policy. If we determine that the issue is legitimately one over which the General Assembly has authority, then our inquiry must end." *Town of Telluride v. Lot Thirty–Four Venture, L.L.C.*, 3 P.3d 30, 38 (Colo.2000) (citations omitted).

Applying this general jurisprudence to the education clause, we observed in *Lujan* that:

> While our representative form of government and democratic society may benefit to a greater degree from a public school system in which each school district spends the exact dollar amount per student with an eye toward providing identical edu-

8. Specifically, when asked to define its constitutional language "high quality public educational institutions," the Illinois Supreme Court held that:

> The constitution provides no principled basis for a judicial definition of high quality. It would be a transparent conceit to suggest that whatever standards of quality courts might develop would actually be derived from the constitution in any meaningful sense. Nor is education a subject within the judiciary's field of expertise, such that a judicial role in giving content to the education guarantee might be warranted. Rather, the question of educational quality is inherently one of policy involving philosophical and practical considerations that

call for the exercise of legislative and administrative discretion.

*Comm. For Educ. Rights*, 220 Ill.Dec. 166, 672 N.E.2d at 1191.

Also, in a recent case in which the plaintiffs alleged an unconstitutional and "inadequate" public school system because of insufficient funding, the Nebraska Supreme Court held, "[w]e interpret the paucity of standards in the free instruction clause as the framers' intent to commit the determination of adequate school funding solely to the Legislature's discretion, greater resources, and expertise." *Nebraska Coal. for Educ. Equity & Adequacy v. Heineman*, 273 Neb. 531, 731 N.W.2d 164, 180 (2007).

cation for all, these are considerations and goals which properly lie within the legislative domain. *Judicial intrusion to weigh such considerations and achieve such goals must be avoided. This is especially so in this case where the controversy, as we perceive it, is essentially directed toward what is the best public policy which can be adopted to attain quality schooling and equal educational opportunity for all children who attend our public schools.* 649 P.2d at 1018 (emphasis added). Hence, this court has firmly held that defining a "thorough" or "adequate" education is a policy determination for the legislature. *See also Comm. For Educ. Rights*, 220 Ill.Dec. at 179, 672 N.E.2d at 1191 ("[T]he question of educational quality is inherently one of policy involving philosophical and practical considerations that call for the exercise of legislative and administrative discretion.").

Also, while some state courts have chosen to opine on constitutional provisions similar or identical to ours, they have offered wildly disparate conclusions. For example, New Jersey defined "thorough" as "more than simply adequate or minimal," but Montana focused on promoting "physical well-being" in order to become an asset to the state. *Compare Robinson v. Cahill*, 118 N.J.Super. 223, 287, 287 A.2d 187, 211 (Law Div.1972) *with McNair v. Sch. Dist. No. 1*, 87 Mont. 423, 288 P. 188, 190 (1930). Similarly, Wyoming defined "thorough" as "marked by full detail or complete in all respects and productive without waste," while West Virginia held that the school system must properly prepare students and that it do so "economically." *Compare Campbell County Sch. Dist. v. State*, 907 P.2d 1238, 1258–59 (Wyo.1995) *with Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859, 877 (1979). There is no national standard

from which this court could adopt a definition of "thorough", and, more importantly, the varying definitions other states ascribe to the term illustrate no consensus on what "thorough" means. As such, any definition we might construe would necessarily constitute a policy determination.

And, of course, once courts begin to make policy, it is difficult to stop. The Nebraska Supreme Court observed: "The landscape is littered with courts that have been bogged down in the legal quicksand of continuous litigation and challenges to their states' school funding systems. Unlike those courts, we refuse to wade into that Stygian swamp." *Nebraska Coal. for Educ. Equity & Adequacy*, 731 N.W.2d at 183.[9]

### D. The Impossibility of a Court's Undertaking Independent Resolution without Impinging Upon Coordinate Branches of Government

Turning now to the fourth *Baker* factor, the Supreme Court demands a finding of nonjusticiability if no decision can be rendered without impinging upon legislative authority. *Baker*, 369 U.S. at 217, 82 S.Ct. 691. In addition to the considerations specified in the previous sections, a ruling by this court that more funding must go towards education would almost certainly take funding from other state programs. Such a broad imposition on legislative fiscal authority is clearly beyond the proper judicial scope. *See Coal. for Adequacy & Fairness in Sch. Funding, Inc. v. Chiles*, 680 So.2d 400, 406–07 (Fla. 1996) (refusing to define an "adequate" education for fear that "the courts would necessarily be required to subjectively evaluate the Legislature's value judgments as to the spending priorities to be assigned to the

---

9. New Jersey's experience is instructive. The New Jersey Supreme Court oversaw education from the bench for decades, "consuming significant funds, fees, time, effort, and court attention. The volume of litigation and the extent of judicial oversight provide a chilling example of the thickets that can entrap a court that takes on the duties of a Legislature." *City of Pawtucket v. Sundlun*, 662 A.2d 40, 59 (R.I.1995). *The New Jersey cases regarding school financing include Abbott v. Burke*, 136 N.J. 444, 643 A.2d 575 (1994); *Abbott v. Burke*, 119 N.J. 287, 575 A.2d

359 (1990); *Abbott v. Burke*, 100 N.J. 269, 495 A.2d 376 (1985); *Robinson v. Cahill*, 79 N.J. 464, 360 A.2d 400 (N.J.1976); *Robinson v. Cahill*, 70 N.J. 155, 358 A.2d 457 (1976); *Robinson v. Cahill*, 69 N.J. 449, 355 A.2d 129 (1976); *Robinson v. Cahill*, 69 N.J. 133, 351 A.2d 713 (1975); *Robinson v. Cahill*, 67 N.J. 333, 339 A.2d 193 (1975); *Robinson v. Cahill*, 67 N.J. 35, 335 A.2d 6 (N.J.1975); *Robinson v. Cahill*, 63 N.J. 196, 306 A.2d 65 (1973); and *Robinson v. Cahill*, 62 N.J. 473, 303 A.2d 273 (1973).

state's many needs, education being one among them.").[10]

Overall, the first four *Baker* factors each yield a conclusion that defining a "thorough" education is not a justiciable question that should be heard in this court. *Baker* presents an established, cogent standard for weighing political questions, and this court should adhere to its conclusion that this case demands dismissal for want of justiciability.

### III. *Lujan* and the Proper Political Question Standard

Based on the above discussion of the *Baker* factors, I believe that this court should not exercise its jurisdiction to decide this case but rather should find the issues posed to be nonjusticiable. My adoption of the political question doctrine and the lack of justiciability in this case should not be interpreted, however, to impose an absolute bar on educational questions in the courts. Rather, I believe that some cases involving the education clause should be adjudicated in this court. The difficulty is deciding, in a principled way, which ones present a justiciable question and which ones a political question.

As noted previously, the political question doctrine draws from the earliest days of the judiciary, and the reasoning underlying creation of the principle elucidates the difficult questions confronting this court today. Speaking of the first United States Supreme Court decisions that defined the role of the judicial branch, Rachel Barkow observed:

> It was appropriate at that time for courts to engage in a threshold inquiry to determine how much interpretive room a constitutional delegation of power gave the branch receiving that power. *While the courts remained responsible for declaring the boundaries, it was recognized that the Constitution contemplated room for the political actors to give substantive meaning within those boundaries.*

Rachel Barkow, *More Supreme than Court? The Fall of the Political Question Doctrine and the Rise of Judicial Supremacy*, 102 Colum. L.Rev. 237, 252 (2002) (emphasis added).

When this court found *Lujan* justiciable, it did so as part of the "threshold inquiry" to "give substantive meaning" to the constitutional term "uniform." In holding that "[t]he constitutional mandate which requires the General Assembly to establish 'a thorough and uniform system of free public schools,' is not a mandate for absolute equality in educational services or expenditures," the *Lujan* court defined the boundary of the General Assembly's power to lie beyond absolute equality in spending. 649 P.2d at 1018. But it did so without impinging upon the General Assembly's constitutional power over education; it did so without stepping beyond the bounds of the judicial branch and defining exactly what funding levels will equal a "thorough and uniform" education in this state.

The *Lujan* court was careful to stress that "[o]ur decision today declares only that [the education system at the time] is constitutionally permissible." *Id.* at 1025. It further emphasized that, "whether a better financing system could be devised is not material to this decision, as our sole function is to rule on the constitutionality of our state's system." *Id.*

Turning now to the far different question presented in this case, plaintiffs here ask the court to move beyond a threshold inquiry and actually design and implement a better financing system. *Lobato*, 216 P.3d at 32 (plaintiffs demand "an injunction compelling defendants to design, enact, fund, and implement a school financing system...."). This request is truly remarkable in light of *Lujan's* narrow holding. *Lujan*, 649 P.2d at 1025. Instead of asking within what boundaries must the General Assembly make educational policy, plaintiffs want this court to enter into an unbounded inquiry into what makes the best financing system for students. While the question is undoubtedly important, it is a question which, in my opin-

---

**10.** I refrain from discussion of the final two *Baker* factors because no case has considered them in any significant depth and, more importantly, my finding that all four of the first factors auger against justiciability makes further discussion unnecessary.

ion, is specifically reserved for the General Assembly, not the courts.[11]

I believe that it is just such a distinction between properly defining constitutional parameters and improperly determining the policy questions within those boundaries that should guide this court in the future.[12] The *Baker* factors employed above together with a common sense view of political questions can and should guide the Colorado courts on these matters.

I hope the General Assembly will address any educational disparities that might threaten the health of this state, but I also refuse to commit the courts to the resolution of this clearly legislative policy determination.

## IV. Conclusion

"Constitutions must necessarily be interpreted to meet the needs of changing times, but the critical, constitutionally-prescribed boundary separating the executive and legislative powers must remain constant." *Lamm*, 704 P.2d at 1378. I would hold today

that this court should apply this unquestionably prudent logic to the judiciary as well, reinforcing the boundaries between all three branches of government. Education funding in this state may represent a crisis demanding resolution, but that resolution must take place within the constitutionally-prescribed forum as the inherent policy determinations in such a remedy lie outside the scope of this court.

For these reasons, I respectfully dissent from the majority opinion regarding justiciability.

I am authorized to state that Justice COATS and Justice EID join in this dissent.

---

11. *See also Chiles,* 680 So.2d at 406–07 ("While the courts are competent to decide whether or not the Legislature's distribution of state funds to complement local education expenditures results in the required *'uniform system,'* the courts cannot decide whether the Legislature's appropriation of funds is adequate in the abstract, divorced from the required uniformity. To decide such an

abstract question of 'adequate' funding, the courts would necessarily be required to subjectively evaluate the Legislature's value judgments as to the spending priorities." (emphasis in original)).

12. *See supra* section II.B.