24CA1957 Adams v PERA 08-28-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1957
City and County of Denver District Court No. 24CV31993
Honorable Martin F. Egelhoff, Judge

Adams-Arapahoe School District 28J, Adams County School District 14,
Englewood School District No. 1, Harrison County School District 2, Arapahoe
County School District No. 6, ESS West, LLC, and Kelly Services Inc.

Plaintiffs-Appellants,

v.

Colorado Public Employees' Retirement Association,

Defendant-Appellee.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE FOX
Schutz and Bernard*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 28, 2025

Caplan and Earnest, LLC, Michael W. Schreiner, Elliot V. Hood, Caroline G.
Gecker, Boulder, Colorado, for Plaintiffs-Appellants Adams-Arapahoe School
District 28J, a/k/a Aurora Public Schools, Adams County School District 14,
Englewood School District No. 1, Harrison County School District 2, and
Arapahoe County School District No. 6

Faegre Drinker Biddle & Reath LLP, Teresa Akkara, Denver, Colorado; Faegre
Drinker Biddle & Reath LLP, Aaron D. Van Oort, Minneapolis, Minnesota, for
Plaintiff-Appellant ESS West, LLC

Hall & Evans LLC, Jared Ellis, Denver, Colorado, for Plaintiff-Appellant Kelly Services Inc.

Fox Rothschild LLP, Caleb Durling, Spencer R. Allen, Denver, Colorado, for Defendant-Appellee

Kutz & Bethke LLC, William P. Bethke, Vesna Milojevic, Lakewood, Colorado, for Amicus Curiae The Colorado League of Charter Schools

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     Plaintiffs, Adams-Arapahoe School District 28J, a/k/a Aurora Public Schools (APS), Adams County School District 14, Englewood School District No. 1, Harrison County School District 2, Arapahoe County School District No. 6 (collectively, the School Districts) and ESS West, LLC (ESS) and Kelly Services Inc. (Kelly) (collectively, the Vendors), appeal the district court's judgment dismissing their complaint against defendant, the Colorado Public Employees Retirement Association (PERA), for lack of jurisdiction because (1) the School Districts failed to exhaust their administrative remedies, and (2) the Vendors lacked standing.[1]  We reverse the district court's dismissal on exhaustion grounds but affirm its dismissal of the Vendors for lack of standing and remand for further proceedings.

## I.     Background

¶ 2     PERA is "an instrumentality of the state" of Colorado that manages state employees' retirement pensions, including the pensions of public employees in "all school districts in Colorado."

---

[1] We also received an amicus brief from the Colorado League of Charter Schools that generally aligned with the arguments raised by the School Districts and Vendors.

§§ 24-51-101(20), -201(1), -201(2)(a.5), C.R.S. 2025.  It acts through its board of trustees.  *See* § 24-51-202, C.R.S. 2025.  The Vendors are "private education staffing agenc[ies] that specialize[] in placing qualified staff in K-12 school district positions, including substitute teachers, substitute paraprofessionals, and other substitute school support staff."  In the summer of 2016, APS contracted with Kelly to fill substitute teacher positions; the other School Districts had similar arrangements with ESS.

¶ 3     In September 2016, PERA communicated with APS over its "decision to privatize its staffing of substitute employees."  PERA explained that it was "not attempting to interfere with decisions that APS feels are in its best interests," but it was "concerned about the privatization of jobs that have traditionally been held by APS employees" because "the removal of employees from the PERA system negatively impacts the elimination of the unfunded liabilities of the PERA trust fund and shifts the financial impacts within the PERA School Division."  PERA concluded that it would "respect APS' decision to classify the substitute employees as employees of [Kelly]

2

and not the school district" while "reserve[ing] the right to challenge APS' classification . . . in the future."[2]

¶ 4    On June 30, 2023, PERA did just that by challenging the PERA membership status of APS' Kelly-outsourced substitutes. PERA noted that, "[i]n using a third-party entity to staff substitutes, [APS] has incorrectly taken the approach that these individuals are not entitled to PERA membership because they are 'employees of' the third party; as a result, [APS] is relieved of the responsibility to pay PERA contributions."  PERA detailed that APS' approach "negatively impacts the PERA trust fund" and "creates inconsistencies between different school districts within the state." Further, PERA reasoned that allowing this arrangement would (1) lead to some substitutes not receiving PERA benefits they are entitled to; (2) unfairly burden school districts that are paying their substitutes' PERA contributions; and (3) undermine rules governing retirees' ability to work within school districts.

¶ 5    And it concluded,

---

[2] PERA similarly communicated with Englewood School District No. 1 in 2018 and Harrison County School District 2 in 2023 about whether employing substitutes through Kelly would have PERA implications.

3

PERA does not agree that substitutes performing functions that have traditionally been held by employees of the District can be removed from PERA membership simply by inserting a private entity, here [Kelly], into the relationship. For PERA purposes, these individuals are considered employees of the District because pursuant to Colorado law, all employees of the District are required to be members of PERA as a condition of employment. It is PERA's position that regardless of whether the District pays its substitute employees directly, or utilizes a third party to place and/or pay substitute employees, these substitute employees are required to be PERA members.

¶ 6    As a result, while PERA maintained that APS could continue working with Kelly "to coordinate the scheduling of substitute employees[,] . . . both employer and member contributions [would be] owed to PERA on behalf of all of the District's substitute employees pursuant to Colorado law." PERA gave APS until July 1, 2024, to comply with this mandate, recognizing that the rule "represent[ed] a change from current practices and [could] require logistical alterations by multiple parties."

¶ 7    PERA then communicated its position to all school districts, sending "an email to all School . . . employers . . . to clarify that[, effective July 1, 2024,] all substitute teachers must be members of

4

PERA regardless of whether the school or district fills those roles using a third party" (the Substitute Rule). PERA explained that "all substitute teachers are considered employees of the PERA affiliated employer pursuant to Colorado Law" and that "it [wa]s PERA's position that regardless of whether an affiliated employee pays its substitute employees directly or utilizes a third party to place and/or pay substitute employees, these substitute employees are required to be PERA members."

¶ 8 PERA explained its position in greater detail in a later message:

> For other outsourced positions, the test of whether an individual is an "employee" of the PERA affiliated employer — and thus whether PERA membership is required — remains the same as it currently exists. PERA employers must review applicable factors to determine whether an individual is an "employee" of the school or the district. Factors may also indicate that an individual is an independent contractor, an employee of a third-party staffing agency, or a concurrent employee of both the PERA employer and staffing agency. If the individual is an employee of the district or a concurrent employee of the district with some other entity, PERA membership is required.

> Part of this analysis may depend on the individual's role and the relationship to a

school.  For example, teaching is a core function of a school with specific state requirements for performing those duties, but some services, like snow removal, are more incidental.  Some services may more easily lend themselves to outsourcing without creating an employee relationship.  Colorado law governing PERA grants PERA authority to determine membership status and exemption from membership.  PERA will review an employer's classifications of other outsourced positions upon request.

¶ 9　On June 27, 2024, before the Substitute Rule was to take effect, the School Districts and the Vendors sued PERA.  The School Districts and the Vendors argued that PERA (1) acted beyond its authority and could not dictate whether Kelly and ESS employees were PERA employees; and (2) did not comply with Colorado's State Administrative Procedure Act (APA), *see* § 24-4-103, C.R.S. 2025, when it issued the Substitute Rule.  The School Districts and the Vendors requested a declaratory judgment and later moved for a temporary restraining order and preliminary injunction (TRO/PI).

¶ 10　PERA responded by moving to dismiss the complaint pursuant to C.R.C.P. 12(b)(1).  PERA argued that (1) the School Districts' claims were unripe because they had failed to exhaust their administrative remedies before filing suit; and (2) the Vendors

6

lacked standing because any impact to their business would be indirect, and they had also failed to exhaust their administrative remedies.

¶ 11    The district court ruled in PERA's favor.  The court noted that it was undisputed that the School Districts and the Vendors had failed to seek any administrative remedy before seeking judicial review.  The court found that section 24-51-205(1), C.R.S. 2025, granted PERA "the authority to determine [PERA] membership status" and that "[s]uch decisions by the board may be appealed through the administrative review procedures set forth in the board rules.  Such final decision[s] by the board shall be subject only to review by proper court action."

¶ 12    The court reasoned, "As evident from the language and structure of the statute, the legislature intended the statutory remedy to be the primary remedy, such that judicial review must be preceded by the Board's administrative review procedure and final decision."  As a result, the court found that it lacked jurisdiction to address the School Districts' claims because they had failed to exhaust PERA's administrative remedies.  The court also found that the Vendors lacked standing because the indirect harm they might

suffer did not constitute injuries in fact or injuries to legally cognizable interests. The court therefore dismissed the complaint and deemed the motion for a TRO/PI moot.

¶ 13    This appeal followed. The School Districts and the Vendors raise three issues on appeal, all of which were preserved. *See Brown v. Am. Standard Ins. Co. of Wis.*, 2019 COA 11, ¶ 21.

## II.    Analysis

### A.    Whether the Substitute Rule is Quasi-Legislative or Interpretive

¶ 14    First, the School Districts and the Vendors argue that the court erred by dismissing the complaint for failure to exhaust administrative remedies because that requirement only applies to quasi-adjudicative decisions. They argue that PERA engaged in quasi-legislative rulemaking when it issued the Substitute Rule, pointing to the rule's prospective and general applicability. They contend that under the APA, section 24-4-106, C.R.S. 2025, and C.R.C.P. 57, they could seek judicial review of the Substitute Rule. They add that, even if an appeal to the PERA Board was a theoretical vehicle to obtain administrative review, that remedy would have been futile.

¶ 15 PERA responds that its statutory authority to determine membership status under section 24-51-205(1) is broad and challenges to its determinations must follow the administrative process outlined in PERA Rule 2.20, 8 Code Colo. Regs. 1502-1:2; only after this process is complete can an aggrieved party seek judicial review. PERA contends that when it clarifies its positions on various matters to answer questions raised by members and employers, it is not engaging in formal rulemaking. Moreover, PERA argues that if it engaged in rulemaking at all, the Substitute Rule was a valid interpretative rule. PERA adds that C.R.C.P. 57 does not eliminate the exhaustion requirement, and that administrative review would not be futile.

### 1. Standard of Review and Applicable Law

¶ 16 "We review de novo a district court's determination that it lacks subject matter jurisdiction. Similarly, we review de novo the court's determination of whether a plaintiff's complaint sought review of a governmental body's quasi-judicial functions or its quasi-legislative actions." *Freed v. Bonfire Ent. LLC*, 2024 COA 65, ¶ 13 (citation omitted).

9

¶ 17 "An action is quasi-judicial, and . . . subject to review under [C.R.C.P.] 106(a)(4), when it 'involves the determination of the rights, duties, or obligations of specific individuals' based on the 'application of presently existing legal standards or policy considerations to past or present facts . . . [to] resolv[e] the particular interests in question.'" *Id.* at ¶ 12 (quoting *Farmers Water Dev. Co. v. Colo. Water Conservation Bd.*, 2015 CO 21, ¶ 18). In contrast, "a governmental body's quasi-*legislative* actions are reviewed under [C.R.C.P.] 57" and "are usually prospective, reflect public policy relating to matters of a permanent or general character, and are not restricted to identifiable persons or groups." *Id.*

¶ 18 Under section 24-51-205(1), PERA's trustees have "the authority to determine membership status" of state employees. Section 24-51-205(1) also details that, "[s]uch decisions by the board may be appealed through the administrative review procedures set forth in the [PERA] rules. Such final decision by the board shall be subject only to review by proper court action." While PERA has the authority to "adopt and promulgate . . . rules for the administration of the association," the issuance of any legislative

rules must follow the APA's notice-and-comment rulemaking procedural requirements in section 24-4-103. § 24-51-204(5), C.R.S. 2025. Rules that are not properly promulgated may not "be relied upon or cited against any person." § 24-4-103(10).

¶ 19    Interpretive rules, in contrast to legislative rules, are not governed by section 24-4-103 because they "are not meant to be binding as rules." § 24-4-103(1). "Whether a rule is legislative or interpretive depends on its effect: it is legislative if it establishes a norm that commands a particular result in all applicable proceedings; it is interpretive if it establishes guidelines that do not bind the agency to a particular result." *Hammond v. Pub. Emps.' Ret. Ass'n of Colo.*, 219 P.3d 426, 428 (Colo. App. 2009).

¶ 20    Next, in the context of administrative law, the exhaustion doctrine provides that "courts will not intervene until a petitioner has exhausted all available administrative remedies." *Crow v. Penrose-St. Francis Healthcare Sys.*, 169 P.3d 158, 164 (Colo. 2007). The exhaustion doctrine "applies with equal force when the party seeks declaratory relief" through Rule 57. *City & County of Denver v. United Air Lines, Inc.*, 8 P.3d 1206, 1213 (Colo. 2000).

¶ 21    The policy reasons supporting the exhaustion doctrine include (1) allowing "an administrative agency to develop a sufficient factual record so that the agency itself and later-reviewing courts can adequately review the agency's decision"; (2) promoting "administrative efficiency by ensuring an uninterrupted administrative process"; (3) ensuring "agency autonomy, giving the agency a chance to correct its own errors through internal processes without the court's intervention"; and (4) conserving "judicial resources by ensuring that courts only become involved with disputes when the administrative process fails to produce an adequate remedy." *Crow*, 169 P.3d at 164-65.

¶ 22    While the exhaustion doctrine is primarily associated with "quasi-judicial action[s], not . . . quasi-legislative (i.e., rulemaking) action[s]" and there is a perception that the exhaustion doctrine only applies to quasi-judicial actions, there is "no such absolute rule." *Moss v. Members of Colo. Wildlife Comm'n*, 250 P.3d 739, 743, 745 (Colo. App. 2010) (holding that plaintiffs' challenge to a quasi-legislative rule was not excused from the exhaustion doctrine on the grounds that adequate administrative remedies were unavailable because plaintiffs could have petitioned to amend or

repeal the rule through section 24-4-103(7) and providing that "[a]ny interested person shall have the right to petition for the issuance, amendment, or repeal of a rule"); *see also Colo. Ground Water Comm'n v. Eagle Peak Farms, Ltd.*, 919 P.2d 212, 218-19 (Colo. 1996) (determining that a rule promulgated by the commission was subject to APA review and noting that parties in rulemaking proceedings "are required to exhaust their administrative remedies before seeking judicial review").

¶ 23    The exhaustion doctrine, however, "is subject to limited exceptions." *United Air Lines, Inc.*, 8 P.3d at 1213.  Exhaustion is unnecessary "when it is 'clear beyond a reasonable doubt that further administrative review by the agency would be futile because the agency will not provide the relief requested.'"[3]  *Id.* (citation omitted).  Most relevant here, "[i]f the agency refuses to reconsider its decisions or procedures, or has stated a categorical rule to apply in a group [of] cases, rendering exhaustion futile, . . . courts will

---

[3] Exhaustion is also unnecessary when "the matters in controversy are matters of law that the agency lacks the authority or capacity to determine, such as constitutional issues" or challenging the constitutionality of an agency's governing statutes.  *City & County of Denver v. United Air Lines, Inc.*, 8 P.3d 1206, 1213 (Colo. 2000).

excuse a party's failure to exhaust available administrative remedies." *Id.*

## 2. Analysis

¶ 24 Initially, we conclude that the Substitute Rule is *not* a quasi-judicial decision because it bears none of the characteristics of a quasi-judicial action. It does not apply current or existing PERA standards to determine the obligations of specific individuals nor does it resolve a question of particular interests. *See Freed*, ¶ 12. Instead, it applies prospectively to a broad class of people without consideration of the particular facts of any individual case. The Substitute Rule was adopted pursuant to PERA's rulemaking authority rather than its quasi-judicial authority. *See id.*

¶ 25 PERA reiterates, however, that it has statutory authority to determine PERA membership status, *see* § 24-51-205(1), and directs our attention to cases in which courts affirmed PERA's authority under this provision to argue that PERA was not required to engage in formal rulemaking to issue the Substitute Rule. *See Taylor v. State Pers. Bd.*, 228 P.3d 273, 279 (Colo. App. 2010) ("[T]he issue of whether Taylor was an employee for purposes of receiving PERA service credits, which is the remedy that Taylor

14

ultimately seeks, is indeed within PERA's jurisdiction."); *see also Pub. Emps.' Ret. Ass'n v. Stermole*, 874 P.2d 444, 446 (Colo. App. 1993) (Section 24-51-205(1) "places the responsibility on the Board to make the factual determinations as to whether income received by a member is or is not salary received by the member from an employer covered by PERA."). Further, PERA points out that it is an *instrumentality* of the state, *see* § 24-51-201(1), and not a state agency; thus, its rulemaking authority is restricted only by section 24-4-103 of the APA because section 24-51-204(5) specifically commands so. We agree that the plain language of section 24-51-205(1) clearly grants PERA the power to make membership decisions.

¶ 26    But the fact that PERA has the authority to determine membership status — and indeed, whether PERA had the authority under section 24-51-205(1) to issue the Substitute Rule at all (an issue we need not reach) — misses the point. The determinative issue is whether the Substitute Rule is quasi-legislative, as the School Districts and the Vendors posit, or interpretive, as PERA contends.

¶ 27    The Substitute Rule bears none of the characteristics of an interpretive rule.  Interpretive rules "establish[] guidelines that do not bind the agency to a particular result."  *Hammond*, 219 P.3d at 428.  The Substitute Rule did not establish nonbinding guidelines — it announced a categorical rule.

¶ 28    PERA also argues that the Substitute Rule is interpretative because it "interprets the term 'member' as it relates to substitute teachers, one of the hundreds — if not thousands — of different jobs" PERA members hold.  PERA also highlights that its later clarification of the Substitute Rule left open the possibility of a flexible factor-based decision-making process for other types of third-party employees, like snowplow drivers.  But whether PERA's decision-making process may be deemed interpretive as applied to positions other than substitute teachers is not a question before us.  And we reject the argument that simply because PERA is interpreting a statutory term, that necessarily means the Substitute Rule is interpretative.  *See id.*; 32 Charles Alan Wright, Arthur R. Miller & Charles H. Koch, *Federal Practice and Procedure* § 8155 (2d ed. 2001) ("One should not be deceived by a literal reading of the term 'interpretative' and conclude that a rule is interpretative

16

because it interprets a statute or another rule.")). Contrary to PERA's position, the Substitute Rule bears all the hallmarks of a quasi-legislative rule.

¶ 29 The Substitute Rule was a categorical decision that applied to *all* substitute teachers working in Colorado schools — including those employed by third parties and presumably substitutes who were never prior PERA members — and their school districts; deemed all such employees to be PERA members; and required PERA dues from these new members and corresponding contributions from school district employers. It applied prospectively, allowing schools a year to prepare for the upcoming change, applied generally and statewide, and was a permanent and mandatory change. *See Freed*, ¶ 12.

¶ 30 Therefore, pursuant to section 24-51-204(5), the Substitute Rule is a quasi-legislative rule that had to comply with the APA's procedural requirements in section 24-4-103 to bind the substitutes and the school districts. *See* § 24-4-103(10) ("No rule shall be relied upon or cited against any person unless . . . it has been published and, whether adopted before or after said date, it has been made available to the public in accordance with this

section."); *see also Home Builders Ass'n of Metro. Denv. v. Pub. Util. Comm'n*, 720 P.2d 552, 562 (Colo. 1986) (The APA's "statutory requirements are mandatory, and noncompliance is fatal to the agency's rule-making actions" and when an agency does "not follow the rule-making procedure set forth in section 24-4-103," the rule is "void.").

¶ 31    This leads us to the crux of the issue on appeal — whether the School Districts and the Vendors were required to exhaust their administrative remedies before seeking judicial review of the Substitute Rule.  Without PERA having invoked the notice-and-comment process, there were no administrative remedies the School Districts and Vendors could have availed themselves of before going to district court to challenge the Substitute Rule.

¶ 32    PERA argues that the School Districts and the Vendors should have pursued the administrative remedies in PERA Rule 2.20, 8 Code Colo. Regs. 1502-1:2.  These rules outline that parties can seek administrative relief by appealing an initial decision to PERA's Executive Director, *id.* at Rule 2.20(A), and then participating in an administrative hearing before three PERA Board members, *id.* at Rule 2.20(B)-(E), before a final administrative decision can be

reviewed under C.R.C.P. 106(a)(4).  But this decision-making process is quasi-adjudicative, especially because it can be appealed through C.R.C.P. 106(a)(4).  *See Freed*, ¶ 12.  So, a party would not be expected to challenge a quasi-legislative action such as the Substitute Rule in this manner.

¶ 33     To administratively challenge a rule issued via PERA's rulemaking authority would instead involve petitioning for amendment or repeal of the rule through section 24-4-103(7) ("Any interested person shall have the right to petition for the issuance, amendment, or repeal of a rule.").  *See Moss*, 250 P.3d at 745.  And while normally a party challenging a properly promulgated administrative rule would need to avail themselves of this remedy, the record does not show that the Substitute Rule was published in accordance with section 24-4-103.  As a result, section 24-4-103(7)'s process was unavailable.  Ultimately, PERA issued a quasi-legislative rule without adhering to the APA's notice-and-comment procedures outlined in section 24-4-103.  Therefore, the Substitute Rule is void and may not "be relied upon or cited against any person."  § 24-4-103(10); *see also Home Builders Ass'n of Metro. Denv.*, 720 P.2d at 562.

¶ 34    We conclude that (1) the Substitute Rule is quasi-legislative and cannot bind PERA members and employers until it adheres to the APA's procedural requirements under section 24-4-103, and (2) the district court erred by relying on exhaustion principles to dismiss the complaint. We reverse and remand for the district court to address the merits of the School Districts' claims.

## B.    The Vendors' Standing

¶ 35    Next, the School Districts and the Vendors contend that the court erred by dismissing the Vendors for lack of standing. They first argue that we need not address whether the Vendors have standing because they raise identical claims as the School Districts. But if we reach this issue, they contend the Vendors have standing because the Substitute Rule would force them to renegotiate their contracts with the School Districts. Further, the Vendors will have been deprived of the right to participate in notice-and-comment rulemaking and will incur costs in "facilitat[ing] the School's compliance" with the Substitute Rule and "ensur[ing] that their own employees are treated fairly" because of the new administrative obligations imposed on them.

¶ 36    PERA responds that the Vendors were properly dismissed for lack of standing because any economic harm the Vendors could suffer as a result of the Substitute Rule is indirect and speculative. Moreover, PERA argues that the APA does not create substantive rights giving rise to standing, and therefore, the Vendors cannot demonstrate that they have "suffered injury in fact" or that they have suffered an injury to "a legally protected interest as contemplated by statutory or constitutional provisions." *Wimberly v. Ettenberg*, 570 P.2d 535, 539 (Colo. 1977).  Further, PERA argues that simply because the School Districts have standing does not mean that the Vendors do as well.

1.    Standard of Review and Applicable Law

¶ 37    "[S]tanding is a question of law" that we review de novo. *Adams v. Land Servs., Inc.*, 194 P.3d 429, 430 (Colo. App. 2008). "In Colorado, parties to lawsuits benefit from a relatively broad definition of standing." *Ainscough v. Owens*, 90 P.3d 851, 855 (Colo. 2004).  Indeed, the Colorado Supreme Court has noted that "the test in Colorado has traditionally been relatively easy to satisfy." *Id.* at 856.  But "[i]f a court determines that standing does

21

not exist, then it must dismiss" the party's claims. *Hickenlooper v. Freedom from Religion Found., Inc.*, 2014 CO 77, ¶ 7.

¶ 38    "A plaintiff must satisfy two criteria to establish standing: First, the plaintiff must have suffered an injury-in-fact, and second, this harm must have been to a legally protected interest." *Boulder Valley Sch. Dist. RE-2 v. Colo. State Bd. of Educ.*, 217 P.3d 918, 923 (Colo. App. 2009). "[T]he injury-in-fact requirement ensures that an actual controversy exists so that the matter is a proper one for judicial resolution," and while "both tangible injuries (e.g., physical damage) and intangible injuries (e.g., aesthetic deterioration of the environment) can satisfy the injury-in-fact requirement, 'an injury that is overly "indirect and incidental" to the defendant's action' will not convey standing, nor will the remote possibility of a future injury." *Hickenlooper*, ¶ 9 (citations omitted). "The second prong of Colorado's standing test requires that the plaintiff have a legal interest protecting against the alleged injury. This is a question of whether the plaintiff has a claim for relief under the constitution, the common law, a statute, or a rule or regulation." *Ainscough*, 90 P.3d at 856 (citation omitted).

¶ 39     As the School Districts and the Vendors highlight on appeal, in *Lobato v. State*, 218 P.3d 358, 367-68 (Colo. 2009), the Colorado Supreme Court declined to address standing in a constitutional challenge for one group of plaintiffs who may not have otherwise had standing.  The supreme court explained that the "plaintiff school districts raise the same claims as the individual plaintiff parents.  The continued participation of the school districts in this case is similar to the role of permissive intervenors and does not require standing independent of plaintiffs with standing."  *Id.* at 368; *see also* C.R.C.P. 24(b) (governing permissive intervenors).  The supreme court therefore determined that it did not need to "evaluate the plaintiff school districts' standing provided that they raise[d] claims identical to those of the plaintiff parents" and allowed them to continue as plaintiffs in the case.  *Id.*  But the court cautioned in a footnote that "if the plaintiff school districts were to inject novel issues into the case or otherwise invoke the court's subject matter jurisdiction, then the school districts would have to possess independent standing, and the trial court would evaluate the school district's standing."  *Id.* at 368 n.9.

¶ 40    So when one party has standing, it may not be necessary to determine whether other parties have standing if they have identical claims that do not inject "novel issues" into the case or "otherwise invoke the court's subject matter jurisdiction."  *Id.* at 368, 368 n.9; *see also Aurora Pub. Sch. v. A.S.*, 2023 CO 39, ¶ 34 (When two parties "raise[d] the same [constitutional] argument" and there was no dispute that one had standing, the court had subject matter jurisdiction, and "it [was] not necessary to address the standing of [the other party] to bring the identical claim." (citing *Lobato*, 218 P.3d at 368)); *Chostner v. Colo. Water Quality Control Comm'n*, 2013 COA 111, ¶ 22 ("Given that the Coalition and the District Attorney assert identical arguments on appeal, we need not reach the issue of whether the District Attorney has standing independent of the Coalition.").

¶ 41    Importantly, courts still must dismiss parties that lack standing if their claims are not identical or if they invoke distinct subject matter jurisdiction issues.  *See, e.g., Jones v. Samora,* 2016 COA 191, ¶¶ 30-41 (analyzing parties' standing separately to conclude that an individual lacked standing because they alleged they lost an elected position, which was unconnected to harms

24

associated with a mail-in ballot contention, while the other party had organizational standing because of a member's alleged loss of the right to cast secret ballots).

## 2.   Analysis

¶ 42    We conclude that the Vendors' claims are not identical to the School Districts', and that the Vendors lack independent standing to challenge the Substitute Rule.

¶ 43    During oral arguments the division inquired about standing and, more specifically, about what the Vendors added to the case. Counsel for the School Districts and Vendors argued that the Substitute Rule implicates the Vendors' interests.  Counsel also asserted, however, that while the Vendors have their own claims for which they have independent standing, their claims "rise and fall together" with the School Districts' claims, allowing them to remain in the case per *Lobato*.  But when the division inquired about how the Vendors' claims might affect a hypothetical settlement agreement, counsel responded that the Vendors have interests "beyond" the School Districts' interests.  Further, counsel argued that the Vendors would likely need to be "involved" in some fashion with any settlement agreement that affected their employees.

¶ 44     The Vendors cannot rely on *Lobato* to simultaneously assert that their standing is irrelevant because their claims are identical to the School Districts' while also contending that they have their own claims that generate independent standing — ones that would entitle them to be involved in the other parties' settlement agreement no less.  *See Lobato*, 218 P.3d at 368 (comparing parties with *Lobato* standing to permissive intervenors); *cf. Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 529 (1986) ("[W]hile an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent.").

¶ 45     Put another way, because the Vendors' claims allegedly entitle them to be involved in settlement decisions and implicate interests other than the School Districts' — for example, harms related to the Vendor's administrative costs) — *Lobato* cannot apply.  *Lobato* does not grant standing to parties who otherwise would lack it simply because their interests closely align with a party that has standing. *See* 218 P.3d at 368, 368 n.9.  And because we conclude that

26

*Lobato* cannot allow the Vendors to remain in the case, we must determine whether they have independent standing.

¶ 46 The Vendors assert that they have standing for three reasons: (1) they will have to renegotiate their contracts with the School Districts; (2) they will lose their right to participate in notice-and-comment rulemaking; and (3) they will suffer administrative costs through training and educating their employees, complying with PERA reporting obligations, facilitating the School Districts' compliance, and ensuring "their employees are treated fairly."

¶ 47 As to the Vendors' first and third claims for standing, the alleged harms are both speculative and indirect; thus, they do not constitute injuries in fact. Alleged injuries that are "indirect and incidental" results of a plaintiff's actions are "insufficient to confer standing." *Wimberly*, 570 P.2d at 539 (holding that bail businesses lacked standing to challenge new bail program that could "affect the business of the bail bondsmen as a practical matter" but which did so only "indirectly by permitting criminal defendants to choose amongst an increased number of bail alternatives"); *see also 1405 Hotel, LLC v. Colo. Econ. Dev. Comm'n*, 2015 COA 127, ¶ 49 (Even assuming a project would "cause the Hotels economic harm by

27

drawing away some of their existing customers, such harm is not directly caused by" the plaintiffs' conduct and cannot not confer standing. (footnote omitted)). In effect, the Vendors contend that Substitute Rule would cause them harm because it would increase the costs of doing business with the School Districts. But this is not a direct harm caused by PERA's actions because the Substitute Rule does not directly impose costs on the Vendors. And any specific administrative costs the Vendors will suffer, and whether they will need to amend their contracts with the School Districts, is speculative. *See Hickenlooper*, ¶ 9 ("[T]he remote possibility of a future injury" is "insufficient to confer standing.").

¶ 48    As for whether the Vendors have standing because they lost the right to participate in the rulemaking process, "the APA does not confer standing in and of itself, because it 'does not create substantive legal rights on which a claim for relief can be based.' . . . [S]ome other law must give rise to a cause of action under the APA." *Weld Cnty. Colo. Bd. of Cnty. Comm'rs v. Ryan*, 2023 CO 54, ¶ 15 (quoting *Romer v. Bd. of Cnty. Comm'rs*, 956 P.2d 566, 576 (Colo. 1998)).

¶ 49    The Vendors contend that because the APA is incorporated into PERA's governing statutes through section 24-51-204(5) they have standing to challenge PERA's rulemaking actions.  But PERA's rulemaking authority under section 24-51-204(5) expressly incorporates only the notice-and-comments requirements of section 24-4-103.  And while section 24-51-205(1) authorizes judicial review of PERA's final decisions on membership status, this does not automatically give rise to the legally cognizable rights the Vendors claim confers standing on them here.  *See Colo. State Bd. of Educ. v. Adams Cnty. Sch. Dist. 14*, 2023 CO 52, ¶¶ 51-53.  As a result, the Vendors cannot demonstrate harm to legally protected interest by invoking the APA.  *See Ryan*, ¶ 15; *Romer*, 956 P.2d at 576.

¶ 50    So, the Vendors cannot remain parties to the case because their claims are not identical to the School Districts' claims.  *See Lobato*, 218 P.3d at 368, 368 n.9.  And the Vendors lack independent standing because their alleged economic harms are indirect and speculative, *see Wimberly*, 570 P.2d at 539; *1405 Hotel*, ¶ 49, and they cannot demonstrate a harm to a legally protected interest via the APA, *see Colo. State Bd. of Educ.*, ¶ 52;

29

*Ryan*, ¶ 15; *Romer*, 956 P.2d at 576.  The district court did not err by finding the Vendors lacked standing.

### C.    Preliminary Injunctive Relief

¶ 51    The School Districts finally argue that we should enjoin the Substitute Rule, arguing that they will suffer "immediate and irreparable harm" if we do not and that they are "overwhelmingly likely" to succeed on the merits of their case on remand. Specifically, the School Districts contend that the factors outlined in *Rathke v. MacFarlane*, 648 P.2d 648, 653-54 (Colo. 1982), have been met and warrant an injunction under C.R.C.P. 65.  PERA responds that, because the district court never conducted a hearing on the matter, we lack a sufficient factual record to decide this issue.  PERA also contests whether the *Rathke* factors have been met.

¶ 52    As detailed in *Rathke*, the decision to grant a preliminary injunction "lies within the sound discretion of the trial court," but "injunctive relief should not be indiscriminately granted . . . it should be exercised sparingly and cautiously and with a full conviction on the part of the trial court of its urgent necessity." *Rathke*, 648 P.2d at 653.  Given this high standard,

> [i]n exercising its discretion, the trial court must find that the moving party has demonstrated:
>
> (1) a reasonable probability of success on the merits; (2) a danger of real, immediate, and irreparable injury which may be prevented by injunctive relief; (3) that there is no plain, speedy, and adequate remedy at law; (4) that the granting of a preliminary injunction will not disserve the public interest; (5) that the balance of equities favors the injunction; and (6) that the injunction will preserve the status quo pending a trial on the merits.

*Id.* at 653-54 (citations omitted).

¶ 53    We agree with PERA that we lack a fully developed record to determine whether an injunction is warranted consistent with the *Rathke* factors. The record on appeal is limited given the court's decision to dismiss for lack of subject matter jurisdiction, and there was no hearing concerning injunctive relief that we may review. On remand, the district court will be best positioned to consider whether a hearing is necessary and if so, make the factual determinations necessary to decide whether an injunction is warranted.

## III. Disposition

¶ 54      We reverse the district court's dismissal of the case for lack of exhaustion but affirm the court's dismissal of the Vendors for lack of standing.  We therefore remand the case for the district court to address the merits of the School Districts' claims, including whether, after a hearing, injunctive relief is warranted.

JUDGE SCHUTZ and JUDGE BERNARD concur.